Rose CARPINI and Dominic Carpini,
Her Husband,

v.

PITTSBURGH and WEIRTON BUS COM-
PANY, a Corporation, Appellant, and
General Motors Company, a Corpora-
tion (two cases).

Mary ROCCHIO, a Minor, by Her Parents
and Natural Guardians, John Rocchio
and Pauline Rocchio, and John Rocchio
and Pauline Rocchio in Their Own
Right,

v.

PITTSBURGH and WEIRTON BUS COM-
PANY, a Corporation, and General Mo-
tors Company, a Corporation, Appel-
lant (two cases).

Ann ROCCHIO, a Minor, by her Parents
and Natural Guardians, John Rocchio
and Pauline Rocchio, and John Rocchio
and Pauline Rocchio in Their Own
Right,

PITTSBURGH and WEIRTON BUS COM-
PANY, a Corporation, Appellant, and
General Motors Company, a Corpora-
tion (two cases).

No. 11297–11302.

United States Court of Appeals,
Third Circuit.

Argued Oct. 14, 1954.

Decided Nov. 10, 1954.

Rehearing Denied Nov. 30, 1954.

(David B. Fawcett, Jr., Dickie, Mc-
Camey, Chilcote, Reif & Robinson, Pitts-
burgh, Pa., on the brief), Sanford M.
Chilcote, Pittsburgh, Pa., for Pittsburgh
& Weirton Bus Co.

George Y. Meyer, Pittsburgh, Pa., for General Motors Corp.

James P. McArdle, Pittsburgh, Pa., for plaintiffs.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge.

These are appeals from judgments for the plaintiffs in suits for personal injuries. The tragic occurrence out of which these actions grew can be very briefly described. On the morning of April 29, 1951, a bus operated by an employee of the Pittsburgh and Weirton Bus Company (Weirton) was on its way down a long hill into the town of Weirton, West Virginia. This hill is part of U. S. Route 22 and is sometimes called "Weir Hill." In places the grade is quite steep reaching almost nine per cent. The bus was full of passengers; it was just before church time of a Sunday morning and most of the passengers were on their way to attend church in the main part of town at the foot of the hill. About the time the bus passed Tenth Street, where it swung around another bus operated by the same company, or perhaps a little before, the braking power failed and the driver lost control of the vehicle. Nearing the company's garage at the foot of the hill the driver endeavored to make a right turn so as to start the bus up a shorter hill. His attempt failed; he crashed into a retaining wall and the bus was wrecked. Eleven persons were killed and forty-nine injured.

In this lawsuit the emphasis by the defendants is not in a denial of the right of recovery for the plaintiffs. Instead each defendant has sought to show that the other was responsible. The plaintiffs have been left in the position of being at least semi-spectators to a conflict between the two defendants in the action. The jury brought in a verdict against both of them. The question on this appeal is whether the verdict can stand.

The legal points in the case have been pretty much worked over in recent opinions of this Court and the Supreme Court of Pennsylvania. Here there is federal jurisdiction by diversity only. We have an action brought in Pennsylvania for an alleged tort which took place in West Virginia. We make the same rule of reference to foreign law as would Pennsylvania courts and the Pennsylvania conflict of laws rule is to look to the place where the accident happened to determine the legal consequences of it. We worked through all this in Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 1948, 166 F.2d 908, and 3 Cir., 1950, 183 F.2d 467. In between our two opinions came that of the Supreme Court of Pennsylvania in Foley v. Pittsburgh-Des Moines Co., 1949, 363 Pa. 1, 68 A.2d 517.

Referring, then, to the law of West Virginia, it is clear that we find there the adoption of the general rule concerning the high duty owed by a carrier of passengers to its customers. Venable v. Gulf Taxi Line, 1928, 105 W.Va. 156, 141 S.E. 622. It is undisputed also, by the defendant, General Motors, that the manufacturer of a chattel has a duty of care to the ultimate consumer or user thereof. This was declared to be the law of West Virginia by the Fourth Circuit in General Motors Corp. v. Johnson, 4 Cir., 1943, 137 F.2d 320. To be cited also are Webb v. Brown & Williamson Tobacco Co., 1939, 121 W. Va. 115, 2 S.E.2d 898, and, as to Virginia law, Pierce v. Ford Motor Co., 4 Cir., 1951, 190 F.2d 910. Indeed, this principle has now become so well established that it would be sheer affectation to pile up citation of decisions upon it. See in general Restatement, Torts, § 388 et seq.

The rule of law governing the case being practically undisputed the point for decision becomes whether there is evidence which will uphold the verdict for the plaintiffs against both defendants. If so, the judgments of course must stand. We think there is such evidence.

Consider first the case against Weirton. The district court was very sure in his own mind of the liability here and did not discuss Weirton's liability in any de-

tail. We agree with him that there is sufficient testimony to support the jury's verdict. In the first place this bus was traveling over a road which had a steep grade. It was also covered with rocks and debris on the morning in question because there had been a rather severe storm the night before and the highway people had not by this time in the morning cleaned off the road with their scrapers. The situation was, obviously, one which called for very careful driving in order to exercise reasonable care. The brakes on this bus had caused some difficulty on the driver's earlier trip. There was testimony that he told a passenger that his brakes were not holding and that he stopped in the company's garage near the foot of the hill to have them adjusted. This adjustment occupied something less than five minutes. Whether that was a sufficient precaution is a matter for consideration in determining the general reasonableness of Weirton's operation on this day.

This bus was very heavily overloaded. It had a seating capacity of thirty-eight and there were fifty-nine people in the bus at the time of the accident, not counting the driver. There was testimony that the bus was so crowded that people were standing on the steps (or well) behind the exit door. This testimony is inherently believable. There was another bus which at least on one occasion made an alternate stop with this one. Each was being loaded with passengers for church. Whether it is careful operation to overload a bus so heavily on a steep hill on a road littered with debris is a question for the trier of the fact to consider.

Most striking and dramatic of all the points concerning Weirton was the testimony about the conduct of the driver when this bus started its runaway trip down the hill. An eyewitness testified that he fanned (i. e., pumped) his brakes as practically all of us have been told to do in stopping a car equipped with the brakes with which ordinary passenger cars are furnished. But there was also testimony that this was the worst possible thing to do with air brakes. It seems that with an air brake the way to make it operate effectively is to keep the brake pedal down. Otherwise the air escapes instead of building up pressure on the brake bands. There was, likewise, testimony that drivers are so instructed. Undoubtedly this testimony had persuasive effect on the jury as it well could have had.

We think the whole picture presents one which was proper for the jury's consideration and that the jury was well justified in reaching the conclusion it did.

When we come to the question of liability of General Motors, the case, as the district judge pointed out, is not so easy. The negligence alleged against this defendant is the design of the bus in the matter of pet cocks which could be opened to drain the air chambers. Such drainage, it appears, must take place at rather frequent intervals in wet weather to get out moisture and other impurities from the air chambers. There was testimony that it is desirable to have these outlets as low as possible for efficient drainage. The point made about these pet cocks on this type of bus is that the pet cock is left unprotected and, in a loaded bus, is so close to the ground that it is likely to be damaged or broken by such things as a stone or other object on the highway. The theory, further elucidated, is that this positioning of the pet cock created a hazard dangerous to passengers because, if the pet cock were broken, air would escape and the braking system fail.

On this bus, after the accident, it was discovered that a pet cock was broken off. Sometime later one of Weirton's witnesses found the broken portion of the pet cock at the side of the highway among debris which had been scraped off by the highway people. There was testimony which tended to prove that this broken piece of pet cock matched the remaining piece left in the aperture of the air chamber into which it was screwed.

The theory, then, becomes clear. It is that the design of this braking system, with the pet cock dangerously close to the ground, is one which subjects passengers to the hazard of a failure of the braking system. Then, the theory goes, that hazard became reality in this case. The pet cock broke off, the brakes failed to work, and the catastrophe occurred.

All of this was, of course, the subject of hot dispute at the trial with expert testimony on each side. Likewise disputed was the consequence of the loss of a pet cock and what that would do to the effectiveness of the brakes and how long it would take to do it.

There is also testimony as to what precautions could be taken to eliminate that which the plaintiffs claim is a dangerous hazard. Experts testified as to the possibility of using a plug instead of a pet cock; experts testified to the ease or lack of it by which these pet cocks could be guarded by a shield.

■ General Motors cited the experience over the years with this type of design, tending to show that despite the millions of miles vehicles of this sort have traveled on highways no bus accident of the type here involved has been reported. Of course, that was relevant testimony. Its competency is unchallenged. Its weight was for the trier of the fact. But, of course, it was not conclusive any more than evidence of general practice in an industry is conclusive on whether operations are conducted with due care. This has been clearly held in West Virginia. See American Coal Co. of Allegany County v. De Wese, 4 Cir., 1929, 30 F.2d 349, and authorities cited in the opinion of that case. There was also testimony that in truck operations pet cocks, positioned as these were, have been broken off by objects from the road. This testimony also was relevant because we think the situation of a heavily loaded bus on a littered highway is not greatly dissimilar from the type of operation which trucks may confront, for instance, on highway construction work. The evidence of the expert on the subject of placing and protecting pet cocks was strengthened in part by the admission of Mr. Frank Hudson, Coach Chassis Engineer for General Motors, that a guarded pet cock was practical and that it would add to safety.

■■ We think there is no escaping the conclusion that the evidence here was strong enough to take the case to the jury. The points were hotly contested but after a verdict for the plaintiffs we must, of course, take their evidence at its strongest. There was some point made about the business of separating causal factors. The law on this point was all worked over both by the Supreme Court of Pennsylvania and ourselves in the Pittsburgh-Des Moines cases already cited and that discussion need not be reiterated here. Of course, it is perfectly clear that there can be more than one legal responsible cause for a given injury; otherwise we would have no such thing as joint and several torts. See Restatement, Torts, § 875 et seq.

The judgment of the district court will be affirmed.