**Teddy Gray SHANKLIN, Plaintiff,**

**v.**

**ALLIS–CHALMERS MANUFACTURING COMPANY, a corporation, Defendant.**

**No. 716.**

United States District Court
S. D. West Virginia,
Bluefield Division.

May 20, 1966.

Wade H. Ballard, III, Peterstown, W. Va., Ben B. White, Jr., Princeton, W. Va., Robert S. Irons, Radford, Va., for plaintiff.

Joseph M. Sanders, Sanders & Sanders, Bluefield, W. Va., for defendant.

CHRISTIE, District Judge:

Teddy Gray Shanklin, plaintiff, brings this action seeking to recover damages for injuries he sustained when his left arm was caught in a forage harvester and subsequently amputated three inches below the shoulder. The forage harvester was manufactured by the defendant, Allis-Chalmers Manufacturing Company, and sold by one of defendant's authorized dealers, Greenbrier Tractor Sales, Lewisburg, West Virginia, to plaintiff's employer, Ralph Phillips, Sinks Grove, Monroe County, West Virginia. The testimonial evidence of record was received by the late Judge Harry E. Watkins, sitting without a jury. The case will be decided in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Diversity and requisite amount appearing, jurisdiction is bestowed on the Court by virtue of 28 U.S.C.A. § 1332.

Defendant's liability is predicated on three specific acts of negligence, any one of which, if found to exist, would be sufficient to support a recovery for plaintiff. The complaint asserts the defendant is liable (a) because it negligently assembled, arranged, and constructed the forage harvester and so designed it that there were no guards or barriers to prevent the accident; (b) because the defendant, through its agent, Greenbrier Tractor Sales, was negligent in demonstrating an improper and unsafe method for unclogging the forage harvester; and (c) because defendant, through its agent, Greenbrier Tractor Sales, was negligent as to the instructions given for the proper method of operating the forage harvester. In its answer, defendant denies all allegations of negligence; specifically denies that Greenbrier Tractor Sales was its agent for any purpose—particularly for the purpose of demonstrating the forage harvester in question to the plaintiff. In addition, defendant sets up the affirmative defenses of contributory negligence and/or assumption of the risk.

To properly decide the issues thus raised and make appropriate findings, it is first necessary to have some understanding of the machine which caused the injury. The harvester consists of two fundamental parts, the row crop attachment and the basic machine, generally called a "chopper." The row crop attachment is specifically designed to harvest a crop that is grown in single rows such as the corn plaintiff was harvesting at the time of his injury. In the lower frame of the row crop attachment there is a cutting blade section, consisting of a sickle knife which is located four to six inches off the ground. As the machine moves forward into the stalks of corn,[1] the top gathering chains of the row crop attachment come in contact with the stalks and get them under control as they are severed from the ground by the sickle blade which moves in a stroking motion parallel to the ground. At this point a lower gathering chain, in combination with a flat leaf spring, engages the bottom ends of the stalks and starts them moving at an angle upward into the top end of the stalk chute. As the stalks enter the chute, they kick off to the left and enter into two feed rolls which are still part of the row crop attachment. From there the stalks pass into the basic machine between three rotating feed rolls, thereby compressing and feeding the stalks into a cylinder of cutting knives which chop the stalks into ensilage. From there the ensilage is blown out of the rear of the basic machine or chopper by a blower attachment into a truck that follows behind the harvester. It is of particular significance to note that on the forage harvester a safety compartment, including a door, was built over the feed rolls of the row crop attachment leading into

---

1. The basic machine and the row crop attachments are pulled by a tractor. The operator positions himself on the tractor and is able to control the forage harvester from that point.

the basic machine. On this door a safety sign reads as follows: "WARNING— KEEP AWAY FROM ROLLS UNLESS POWER IS OFF." Also, on the right rear side of the basic machine is the following safety sign:

"BE CAREFUL

1. KEEP ALL SHIELDS IN PLACE.
2. STOP MACHINE TO ADJUST AND OIL.
3. WHEN MACHINE BECOMES CLOGGED, DISCONNECT POWER BEFORE CLEANING.
4. KEEP HANDS, FEET AND CLOTHING AWAY FROM POWER–DRIVEN PARTS.
5. KEEP OFF IMPLEMENT UNLESS SEAT OR PLATFORM IS PROVIDED. KEEP OTHERS OFF."

With this in mind, let us now turn to the evidence of record.

## FINDINGS OF FACT

### I

It is undisputed, and the Court so finds, that in September of 1961, plaintiff, then 36 years of age, was employed by Ralph Phillips to manage his 1,000 acre farm located near Sinks Grove, Monroe County, West Virginia; that plaintiff had been periodically employed by Phillips since 1958 and was during this time living on the Phillips farm in a house provided for him; that Phillips during this time was engaged in coal mining and was only able to be on the farm on weekends; and that plaintiff's duties included, among others, feeding the stock and harvesting the crops.

### II

There is no factual dispute as to how the actual injury occurred. Thus, the Court finds as follows: On September 12, 1961, around 10:30 A.M., plaintiff was operating the forage harvester in question cutting rows of corn into silage for the purpose of filling two silos located on the farm. As the harvester was moving along the rows ensilage quit coming out of the chute, leading plaintiff to believe that the machine was clogged. He stopped the tractor and placed it in neutral gear, leaving the motor on. He, however, left the forage harvester power take-off in gear so that it continued to run in full force. Plaintiff then went back to the left side of the harvester and climbed up on the frame. The corn had rolled and clogged in front of the feed rolls of the row crop attachment. He then reached through the safety door covering the revolving rolls and began loosening the corn some two feet from the rolls. Apparently some of the corn stalks caught his glove and pulled his left arm into the rolls. The rolls in turn crushed his arm and pulled it into the rotating blades of the basic machine which chopped the arm off a few inches above the wrist. Subsequently, the arm had to be amputated approximately three inches below the shoulder.

### III

The basic factual controversy revolves around whether Mr. Arbuckle, owner of Greenbrier Tractor Sales, properly demonstrated and instructed plaintiff as to the correct procedure of running and handling the forage harvester, particularly in demonstrating the safety devices. Since Arbuckle, however, was not made a party defendant to this action, it first becomes imperative to find whether an agency relationship existed between Arbuckle and the defendant, so as to hold the latter liable for Arbuckle's acts. The facts show that Greenbrier Tractor Sales operated under a contract with defendant. By the terms of the contract which was negotiated from year to year, the dealer (Greenbrier Tractor Sales) was given a non-exclusive right to sell the defendant's products in and around the Lewisburg, West Virginia area. The contract specified how the farm equipment, parts and accessories would be sold to the dealer, the inventory which the dealer was to carry, the credit terms between the dealer and the defendant, and advertising, service and other collateral matters relative to the sale of the equipment to the ultimate purchaser. In particular, Section 28 of the contract provided,

"The Dealer is not in any sense an agent of the Company and has no authority to bind the Company in any manner whatsoever or to make any collections for the Company."

Thus, based on the facts in the record and the contractual provisions, this Court finds as a fact that Greenbrier Tractor Sales was not a general agent of the defendant. However, the fact that one is not a general agent for a company does not preclude a finding that a person may be a special agent for a limited or particular purpose. See 1 M.J., Agency, Sections 5, 6 (1948); 3 Am.Jur.2d, Agency, Section 6 (1962). Section 18 of the contract specifically provides in pertinent part as follows:

"The Dealer agrees to assemble and inspect properly all machinery purchased from the Company before the same is delivered to any purchaser, *and to instruct the purchaser upon delivery concerning the proper manner of adjustment and operation of the same;* agrees to make all deliveries promptly to purchaser and to service properly and efficiently machinery sold purchasers." (Emphasis added)

Thus, in Section 28, the defendant withholds from the dealer any power to bind it, yet under Section 18, it clothes the dealer with authority to demonstrate the machine. In a situation such as this the intentions of the parties must be ascertained and given effect. In this regard, Arbuckle testified as follows: "Well, we demonstrated them the way they (Allis-Chalmers) tell us and to the best of our ability, yes, sir." This indicates the control defendant had over the demonstration of their equipment. Viewed in this light, plaintiff was justified in assuming that Arbuckle in demonstrating the machine was acting under the authority and control of the defendant. Therefore, this Court finds as a fact that, notwithstanding the proscriptive language of Section 28, under Section 18 of the contract, Arbuckle was clothed with the authority of a special agent of defendant for the limited purpose of instructing plaintiff as to the proper manner of operating the forage harvester. This finding necessarily eliminates the necessity of considering plaintiff's secondary contention that the duty to instruct was non-delegable.

## IV

Turning now to the actual demonstration: Sometime in the early fall of 1960, the year preceding the accident, plaintiff and Phillips discussed the possibility of purchasing a new forage harvester. It is not quite clear how their interest was communicated to Greenbrier Tractor Sales, but in any event, in September of 1960, Arbuckle and two of his salesmen, Paul Cruise and Elmer Hedrick, took the forage harvester to the Phillips farm for the purpose of demonstrating it. The demonstration lasted some two to three days. The pivotal factual dispute centers around Arbuckle's demonstration of the harvester, in particular when it became clogged. Shanklin testified on direct examination that when Arbuckle was demonstrating the machine,[2] it clogged on several occasions and that he (Arbuckle) merely raised the safety door with his hand and pulled the corn loose and let it feed through the feed rolls while the harvester power was on and the feed rolls operating. In addition to his testimony, plaintiff called Edward Vass and Ocie Eads as witnesses. Vass testified that he was employed at the Phillips farm in September of 1960 to help plaintiff cut the rows of corn and that he was present during the demonstration, although he did not know the identity of the demonstrator. Concerning the clogging of the machine, he testified in pertinent part on questioning by plaintiff's attorney as follows:

"Q. I will ask you what the demonstrator did, if anything, when the machine became stopped with corn.

---

**2.** By his own testimony, plaintiff stated that Arbuckle only ran the machine the first day and that for the remainder of the demonstration he operated it.

"A. Well, all I could say he pulled the corn out. Now what particular part of it he pulled it out from, or something, I wouldn't know.

\* \* \* \* \* \*

"Q. Now, I will ask you to state whether or not when he did that the machine was running or not? Was it stopped?

"A. No, the machine was running.

"Q. Were the feed rollers moving in the machine?

"A. Well, supposedly it was. If they'd all—if that runs when the machine was running, it was running.

"Q. Did the demonstrator cut the tractor off?

"A. No."

On cross-examination, Vass revealed, however, that he was only at the farm for two to three hours during the three-day demonstration of the harvester and for half of that time he was working at the silos. Ocie Eads, owner of the trucks used to haul the forage to the silos, testified that he was at the Phillips farm during the demonstration. Concerning the operation of the forage harvester during that time, Eads stated that he did not pay too much attention because he was not out in the field, but rather at the silo running silage. He further stated that the closest he ever was to the harvester while it was being demonstrated was some three hundred yards. As to his opinion whether or not corn was being unclogged from the machine while it was running, he stated, "It looked like it was running to me. I could hear the sound of the machine a-running. I think it was."

Defendant's evidence as to how the forage harvester was demonstrated came from the testimony of Arbuckle, Paul Cruise, and Elmer Hedrick, Jr. Concerning this factual dispute, Arbuckle testified that when the machine became clogged, while it was hard to remember back that far, it was always his custom to shut off the machine. In particular, he stated that he was sure he did not open the safety door and get in there while the machine was running. He did state, however, it was possible that he may have pulled some stalks out of the top of the row crop attachment to straighten them out while the machine was running. Cruise and Hedrick, salesmen for Greenbrier Tractor Sales, testified that they were present during the demonstration and that they never saw Arbuckle unclog the machine without cutting off the power.

Based on this evidence, the Court finds as a fact that an improper and unsafe method of unclogging the forage harvester was not approved or demonstrated to the plaintiff by Arbuckle. Arbuckle had demonstrated around fifteen similar machines prior to September of 1960 and the Court finds it hard to understand or believe that anyone with his experience would demonstrate a way to use it which was obviously dangerous and could only result in injury to a person following such a procedure. Even plaintiff, by his own testimony, revealed that he was aware of the danger attendant the unclogging of the harvester while the power was on, but stated that he did so only to save time. Little weight can be given the testimony of Vass and Eads. As indicated by his testimony, Vass was only present for an hour and a half on the first day of the demonstration. While during this short time he stated that the machine did become clogged, it is significant to note that he could only assume from the fact that the harvester was running that the feed rolls were rotating when Arbuckle unclogged the corn.[3] Of even greater importance is the fact that Vass did not know from what particular part of the harvester Arbuckle was unclogging or pulling out the corn. Even less weight can be accorded Eads'

---

3. It is uncontradicted in the record that if the harvester is running, it does not necessarily follow that the feed rolls would be moving. An example brought out in the evidence was where the automatic clutch had become disengaged.

testimony since he was never in the field where the harvester was actually being demonstrated, but rather some three hundred yards away at the silo. Furthermore, the testimony of Arbuckle to some extent resolves this conflict. Vass and Eads claim they saw Arbuckle unclog some part of the machine while it was running. Arbuckle stated that he could have, during the demonstration, removed some corn from the top of the row crop attachment (meaning the chute which does not involve the safety door or the feed rolls) while the harvester was running, which would explain the testimony of Vass and Eads.

While there are certain other statements and evidence relating to this conflict, the Court, as the trier of fact and judge of the credibility of the witnesses, finds that this testimony would be of no material benefit to plaintiff in establishing this claim by a preponderance of the evidence.

## V

Plaintiff, secondly, contends that he was not instructed as to the use or purpose of the reverse bar or cylinder wrench which was located on the rear of the basic machine. Arbuckle, on direct examination, testified as follows on questioning by plaintiff's attorney:

"Q. Now, when you demonstrated this machine to him did you point out to him that there was a bar on the back of the machine?

"A. Yes, sir.

"Q. Did you tell him the function of those bars?

"A. Yes, sir.

"Q. You are certain of that, are you, Mr. Arbuckle?

"A. Yes, sir."

Plaintiff, on the other hand, testified as follows:

"Q. Now, at this time, September 12, 1961, did you at that time know about the cylinder wrench?

"A. No siree. In 1961, no, sir.

"Q. Didn't know—

"A. In 1961, no sir."

The fact that during the three hours in which his arm was caught in the machine, plaintiff never once mentioned to any of his fellow employees, friends or neighbors, who were there trying to extricate his arm from the machine, that the cylinder wrench or reversing bar might be used to reverse the feed rolls and free him, tends to give credence to his testimony that Arbuckle did not instruct him as to the purpose or use of the wrench or bar. But, even if we were to find that Arbuckle did not inform plaintiff of the wrench or reverse bar and its proper use, this failure could not support a recovery for plaintiff because it was not the sole or proximately contributing cause of the accident and resulting injury to plaintiff, and the Court so finds as a fact. The purpose of placing the reverse bar on the forage harvester was to assist in removing solid obstructions from the feed rolls such as rocks, corn or fodder, which would jam tightly in the rolls and stall them. Thus, by reversing the direction of the rolls manually by use of the reverse bar, it would aid in the clearing of the obstruction from the feed rolls. Quite clearly then the reverse bar would not be used when the feed rolls were rotating freely. Here, the evidence shows by plaintiff's own testimony that at the time of the accident most of the clogging occurred in the row crop attachment itself around the gathering chains preventing the feed rolls from getting hold of the stalks. Thus, reversing the rolls with the bar would have had no effect whatsoever in clearing the obstruction as the rolls were never stalled in the first place.

## VI

Plaintiff, thirdly, contends that Arbuckle failed to furnish him with the proper instruction and maintenance manual for the harvester. In connection with the instruction manual, an ancillary problem arose at the trial concerning plaintiff's signature on the delivery record for

the forage harvester.[4]  In effect, plaintiff contends that his signature was forged on the original that was sent by Arbuckle to the defendant.  Here, again, accepting plaintiff's contentions as true, the Court finds as a fact that Arbuckle's acts could not have been a proximate or contributing cause of the accident.  Concerning the instruction manual, plaintiff admits having received a white bound manual after the demonstration.  He stated, however, that he did not read the manual, but put it in the machine shed where he had other books on farm machinery.  He further stated that during the following year he made no effort to find out what was in the manual because "I just didn't have the time to get to read it, that is all."  Plaintiff is now contending that the white covered manual was intended for a different model harvester and did not explain the safety features on the harvester in question.  It is apparent, though, that plaintiff did not know whether he had the right manual or not until months after the accident when he found it in the tool shed.  It necessarily follows that even if Arbuckle were negligent in sending the wrong manual, that failure could in no way have been a contributing cause of the accident since plaintiff would not have read the right manual if it had been sent.

■  Likewise, the same is true regarding plaintiff's alleged signature on the delivery record.  Plaintiff, on questioning by defense, admitted the following:

"Q.  Was there anything about the machine that you didn't understand after Mr. Arbuckle completed his three day demonstration?

"A.  Nothing, only the clogging up on it, what could cause it to clog so much.  That is the only thing I didn't understand, and Mr. Ar-

buckle had explained that it was the crop, the condition the crop was in."

Concerning the clogging of the feed rolls, the testimony further showed the following:

"Q.  You knew that if you came in contact with those feed rolls with your gloves or your clothing that it would be pulled into those feed rolls, didn't you?

"A.  Yes, sir.

"Q.  And you knew that just as well as Mr. Arbuckle, didn't you?

"A.  I guess I knew.

"Q.  You knew that and you didn't have to be told about the danger of working back there in that compartment with that power on, did you?

"A.  No, sir.

"Q.  You knew that was dangerous, and you, of course, knew that sign was on the door back there, didn't you?

"A.  Yes, sir.

"Q.  That door that covers the compartment where the feed rolls are located has a sign on it, doesn't it?

"A.  Yes, sir.

 *    *    *    *    *    *

"Q.  And that sign read in large letters: 'Warning Keep Away From Rollers Unless Power is Off,' isn't that right?

"A.  Yes, sir.

"Q.  And you understood that?

"A.  Yes, sir."

Thus, in the light of this evidence, it is clear that plaintiff was well informed of the safe operation, care and handling of the forage harvester, and whether his signature was or was not forged on the delivery record becomes immaterial.

4.  The delivery record is contained in the front part of the instruction manual and is to be filled out in triplicate with the original going to the manufacturer and the two copies going to the dealer and customer.  The delivery record in question

here showed that the forage harvester had been delivered to Ralph Phillips and that the dealer had explained the proper care, safe operation, and adjustments relative to the machine.

## CONCLUSIONS OF LAW

### I

Plaintiff lastly contends that the defendant negligently arranged, assembled and constructed the harvester and so designed it that there were no guards or barriers to prevent the accident. Deciding this issue necessarily involves a mixed question of law and fact. At the outset, a question of significance is whether defendant can be held liable to plaintiff who was not a party to the contract between Arbuckle and defendant. The general rule has been that a manufacturer was not liable to third persons not in contractual relationship (privity) with him for negligence in the construction, manufacture or sale of articles, the basis for this rule derived from the old English case of Winterbottom v. Wright, 10 M & W 109, 152 Eng.Rep. 402 (Ex. 1842). Huset v. J. I. Case Thrashing Machine Co., 120 F. 865 (8th Cir. 1903); Savings Bank v. Ward, 100 U.S. 195, 25 L.Ed. 621 (1879). A contrary rule was seen by the English court in the context of that period as being fraught with such "absurd and outrageous consequences" as to unjustly involve manufacturers in untold litigation with people with whom they had had no contact or business relationship whatever. See 123 A.L.R. 1197 (1939); 58 A.L.R.2d 865 (1958). But, in 1916, the landmark decision of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696 (1916), set a new precedent for fixing tort liability of manufacturers by effectively abolishing the privity requirement where the injury resulted from an inherently or imminently dangerous instrumentality. Defendant vigorously contends that plaintiff has not shown that the forage harvester was inherently or imminently dangerous and thus, there being no privity of contract, plaintiff cannot maintain this action. He is confusing the issue. We are not here concerned with a hidden or latent defect rendering an otherwise safe instrumentality an inherently or imminently dangerous one. Instead, the essence of the complaint here is for *unconcealed* negligence in design, demonstration and instruction. At present, where recovery is sought for negligence in tort, the authorities are virtually unanimous in concluding that the doctrine of privity of contract is no longer acceptable, insofar as that doctrine, of its own force, would immunize a manufacturer from liability to one other than the party to whom he sells his product for injury caused by the product, whether it be inherently or imminently dangerous or whether it be non-inherently or non-imminently dangerous, if the injury sustained by the user was one which might reasonably have been anticipated. Cf. 74 A.L.R.2d 1189 (1960). See also an article in the 1937 Virginia Law Review where the author stated:

"Today the privity requirement is regarded as an antique in the law of torts, foreseeability of harm generally governs the recovery of an injured plaintiff against the manufacturer."

More recent evidence of this attitude is seen in our neighboring state of Virginia, where the legislature has passed the following Code provision:

"Lack of privity between plaintiff and defendant shall be no defense in any action brought against the manufacturer or seller of goods to recover damages for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods; * * *." Code of Va. Section 8.2–318 (1965 added vol.)

The latest West Virginia case touching on the point is Williams v. Chrysler Corporation, 148 W.Va. 655, 137 S.E.2d 225 (1964). There, plaintiff, a passenger, instituted an action against the buyer and manufacturer claiming that the manufacturer owed a duty of reasonable care toward the ultimate user. The Court did not determine or reach this issue as it disposed of the case on the disclaimer provision. It did, however, suggest that

the passage of the Uniform Commercial Code may have affected the law significantly in this area. This line of reasoning may be somewhat misguided, compare 67 W.Va.L.Rev. 291 (1965), in light of the spirited trend toward disregarding privity.[5] But be that as it may, we do not find that the Supreme Court of Appeals of West Virginia has as yet made a clear-cut definitive ruling on the question of privity requirement in the area of a non-inherently or non-imminently dangerous instrumentality. We find, however, that if this case, where negligence is the gravamen of the complaint, were presented to that Court upon the record now before us, it would adopt the modern view by holding that such a showing is not a requirement for maintenance of the action.

## II

Directing our attention to the evidence on negligent design: First, the lack of guards or barriers over the feed rolls. To meet his burden of proof in this regard, plaintiff relies on the testimony of defendant's expert witness, Paul A. Whistler, products engineer for Allis-Chalmers. His testimony, however, persuasively negates plaintiff's claim. He stated, concerning the barriers and guards,

> "It would make the machine incapable of operation because the—those (feed rolls) are working parts of the machine whose function is to contact and control and pull in the crop, and any shield that would make it impossible for an unwise operator to put his hand in there would also stop the function of the machine. However, I would like to point out that we consider the door—the safety door with its warning sign, the combination, a very complete shield, because with that shut you cannot get into the rolls."

Second, lack of an automatic reverse gear that would have reversed the feed rolls without the operator leaving the tractor. In support of this contention plaintiff submitted four advertising circulars from McCormick's and New Holland's field and forage harvesters showing and displaying automatic reverse gears. These circulars, while in effect advocating and stressing efficiency, do not point to the automatic reverse gear as a safety feature. Concerning the practicality of the automatic reverse gear, Whistler's testimony is uncontradicted and is as follows:

> "The reverse mechanism on a harvester of this design would not serve the utopian purpose that might be considered by some people asking for it because in practice, when you have gathering chains and feed rolls and other parts of a machine jammed or plugged with crop or foreign objects, merely reversing the drive does not always and usually does not clear the obstruction. There is still—there is still the great necessity to get off, clean the machine at its various places. Now, one of the reasons that we did not put the reverse—or reverse system into our unit is the peculiar—and peculiar to us—feed roll, as we call it, stone chopper device. Since this machine has a wide cylinder and can cut a thin layer of material, it is possible in our machine, especially with the grass attachment, which is the important part of this particular feature, it is possible to limit the travel of the feed rolls to a very short distance, so that when a rock or solid obstruction that would be large enough to damage the cylinder knives is picked up, the upward travel of the feed rolls are limited and an object as little as—a solid object as little as $5/8$ of an inch to $3/4$ of an inch thick will so overload the feed rolls by pushing them against their top stop that the overload clutch previously referred to in the feed roll drive will become disen-

---

5. Section 402A, Restatement of the Law of Torts; General Motors v. Johnson, 137 F.2d 320 (4th Cir. 1943) and Carpini v. Pittsburgh & Weirton Bus Co., 216 F.2d 404 (3rd Cir. 1954), both applying West Virginia law, and Whorton v. T. A. Loving & Company, 344 F.2d 739 (4th Cir. 1965).

gaged, and this stops the feed rolls with the foreign object in it. \* \* \* With a reverse in such a system, the human nature being what it is, there would be a great tendency to—with an obstruction like some solid obstruction, or even an obstruction of an excessive amount of crop, for the operator to reverse the feed and then let it go forward, and try to jam it through. This could cause serious trouble if there was an object such as a rock or solid object in the way. It was our intent that when the machine became stopped due to an overload, the operator would of necessity, have to turn his tractor off, in order to re-engage the feed roll drive, and to do that he would have to walk back to the feed rolls where he could remove the obstruction from the machine and thus reduce the danger of trying to jam it through."

■ From the above, the Court finds that plaintiff has not come forth with sufficient evidence showing negligent design on the part of defendant in the manufacture of the forage harvester, nor to overcome the defendant's rationale for not installing guard barriers over the feed rolls and an automatic reverse gear. For mere "[f]ailure to adopt the most modern, or even a better safeguard, did not render the manufacturer liable" to plaintiff. Brown v. General Motors, 355 F.2d 814 (4th Cir. 1965).

### III

■ In the circumstances of this case, the mere fact that the plaintiff was injured in the use of the machine that was manufactured by the defendant raises no presumption of defendant's negligence. Saena v. Zenith Optical Co., 135 W.Va. 795, 65 S.E.2d 205. Instead, findings of fault and foreseeability of injury are necessary prerequisites to fixing liability for negligence, the rule of "absolute liability" being inapplicable under the facts and circumstances of this case.

Brown v. General Motors, supra. Thus, to warrant a recovery here, the plaintiff must carry the traditional burdens of proving by a preponderance of the evidence: (a) That the machine was so negligently designed that in its normal operation the manufacturer should have foreseen that it was unreasonably dangerous for the purpose for which it was intended and that this negligent design proximately caused the accident; or (b) That Arbuckle as the agent of the defendant negligently failed to properly demonstrate the machine and which negligence proximately caused the accident; or (c) That Arbuckle as such agent was negligent in not instructing the plaintiff as to the proper use of the machine and which negligence proximately caused the accident. As we view the evidence, the plaintiff has failed to carry his burden as to any of these propositions. Thus, it becomes unnecessary to consider whether he was himself guilty of negligence or that he assumed the risk, either from a factual or legal standpoint.[6] Cf. Cooper v. Prichard Motor Co., 128 W.Va. 312, 36 S.E.2d 405 (1945) and Brown v. General Motors, supra. But, we might observe, notwithstanding the fact that if a finding of negligence against the defendant could in some way be justified, the plaintiff would still be faced with a most formidable task, viz., excusing his failure to heed the sign on the door over the feed rolls warning him to "Keep Away From Rolls Unless Power is Off," and overcoming his clear and positive admission that he knew and appreciated (independent of the warning sign) the dangers inherent in any effort to unclog the feed rolls while the power was on. Brown v. General Motors, supra. His testimony in this regard, hereinabove quoted, leaves no room for doubt whatever on this point, and it becomes the more significant when considered in the light of plaintiff's mature years, reasonable intelligence and considerable exper-

---

6. This finding makes it unnecessary to discuss whether the plaintiff was drinking at the time of his injury. For the record, however, it would be sufficient to say that the evidence supports the conclusion that he was not drinking on the day of the accident.

ience in the operation of farm machinery and equipment. Generally, one cannot charge another in damages for negligence where he himself failed to exercise due care for his own safety. Pritchard v. City Lines, etc., 136 W.Va. 278, 66 S.E. 2d 276.

## IV

So viewed, the plaintiff's complaint will be dismissed and the Clerk directed to enter judgment for the defendant. Counsel will present an appropriate order within ten (10) days.