Teddy Gray **SHANKLIN**, Appellant,

v.

**ALLIS-CHALMERS MANUFACTURING COMPANY**, Appellee.

No. 10887.

United States Court of Appeals
Fourth Circuit.

Argued March 10, 1967.

Decided Oct. 3, 1967.

Wade H. Ballard, III, Peterstown, W. Va. (Ballard & Ballard, Peterstown, W. Va., on the brief), for appellant.

Joseph M. Sanders, Bluefield, W. Va. (Sanders, Sanders & Bivens, Bluefield, W. Va., on the brief), for appellee.

Before J. SPENCER BELL * and WINTER, Circuit Judges, and HARVEY, District Judge.

HARVEY, District Judge:

In this diversity action, a West Virginia farm worker sued the manufacturer of a forage harvester to recover for injuries sustained while he was using such machine to harvest a corn crop. Teddy Gray Shanklin lost his left arm when it became caught in the rolls of the harvester as he attempted to remove clogged corn from the machine while it was operating.

Shanklin claimed below that Allis-Chalmers Manufacturing Company, the manufacturer of the machine, was liable for his injuries (1) because its agent, Greenbrier Tractor Sales, was negligent in demonstrating an improper and unsafe method of unclogging the machine; (2) because such agent was negligent in failing to provide proper instructions for the operation of the machine; and (3) because Allis-Chalmers negligently assembled and constructed the machine. The district court found against Shanklin on each of these issues, and he appeals. We affirm.

The case was originally tried by Judge Harry E. Watkins, sitting without a jury, in the United States District Court for the Southern District of West Virginia. After the testimony had been concluded but before briefs could be filed, Judge Watkins died. In accordance with an agreement between counsel, the case was thereupon submitted to his successor, Judge Sidney L. Christie, for decision on the original record, with the understanding that a similar machine would be demonstrated to Judge Christie and that he would have an opportunity to see Shanklin and view his injury. After

such submission, Judge Christie dismissed Shanklin's complaint, filing an opinion containing findings of fact and conclusions of law. Shanklin v. Allis-Chalmers Manufacturing Company, 254 F.Supp. 223 (S.D.W.Va.1966).

The forage harvester involved in this case consists of two parts, the basic machine itself (colloquially called a "corn chopper") and a row crop attachment. Such an attachment is designed to harvest a crop such as corn, which grows in single rows. Both parts of the harvester are pulled by a tractor with the row crop attachment on the front and the basic machine at the rear. As the machine is pulled forward into the stalks of corn, they are cut by a blade which moves parallel to the ground. The bottom ends of the stalks are then engaged by chains and carried upward into the top end of a stalk chute whence they are directed into two feed rolls and from there into the basic machine itself. In the basic machine, the stalks are compressed by other feed rolls and fed into a cylinder of cutting knives which chop the stalks into ensilage. The ensilage is blown out of the rear of the basic machine into a truck which follows behind the tractor and harvester. When the tractor is not moving, the feed rolls can be stopped by disengaging the drive shaft.

The feed rolls of the row crop attachment leading into the basic machine are housed in a safety compartment and may be reached only by lifting a door. On the front of this door is the following sign:

"WARNING—KEEP AWAY FROM ROLLS UNLESS POWER IS OFF."

On the right rear side of the basic machine there are other safety instructions, including the following:

"1. KEEP ALL SHIELDS IN PLACE.

    *    *    *    *    *    *

"3. WHEN MACHINE BECOMES CLOGGED, DISCONNECT POWER BEFORE CLEANING.

---

* Judge Bell participated in the hearing and concurred in the disposition of the case but died before the opinion was prepared.

"4. KEEP HANDS, FEET AND CLOTHING AWAY FROM POWER DRIVEN PARTS.

\* \* \* \* \* \*"

On the day of the accident, September 12, 1961, Shanklin was working for one Ralph Phillips who owned a one thousand acre farm in Monroe County, West Virginia. Shanklin had lived and worked on the farm for approximately seven years and according to Phillips, "he run my farm for me." [1] Phillips raised beef cattle on his farm and owned mowing machines, hay balers, tractors, corn planters and other power-driven machines, all of which were operated and maintained by Shanklin.

The forage harvester involved here had been purchased by Phillips approximately a year before the accident from Greenbrier Tractor Sales, of Lewisburg, West Virginia, an authorized dealer of Allis-Chalmers. T. A. Arbuckle, President and owner of this dealer, brought the machine to Phillips' farm in September, 1960 and demonstrated it over a period of three days. Shanklin was present throughout the demonstration and operated the machine at that time and for several days thereafter when he harvested his employer's 1960 corn crop. During the time of the demonstration and while Shanklin was using the machine in 1960, it clogged on several occasions. The testimony is conflicting as to Arbuckle's demonstration of the means of unclogging the machine.

About a year later, Shanklin again used the machine to harvest Phillips' corn crop. He had worked two full days before the day of the accident, with the machine occasionally clogging because the corn was heavy and mixed with cane. On the morning of September 12, 1961, he had been working for about three and one-half hours when the machine again clogged. Without turning the power off, Shanklin climbed up on the frame, opened the safety door and while supporting himself with his right hand stuck his left hand into the safety compartment to loosen the corn which had clogged in front of the moving feed rolls of the row crop attachment. Suddenly, his arm was pulled through the rolls and into the rotating blades of the basic machine. As a result of the crushing and mangling of his arm, it was subsequently amputated some three inches below the shoulder.

After reviewing the transcript and seeing a demonstration of the operation of the machine, the district court found (1) that an improper and unsafe method of unclogging the forage harvester had not been approved or demonstrated to Shanklin by Allis-Chalmers' dealer; (2) that even if no instructions were given to Shanklin as to the use of a certain reverse bar for unclogging the machine, such lack was not the proximate cause of the accident; (3) that any failure by the dealer to furnish Shanklin with a proper instruction manual was likewise not the proximate cause of the accident because Shanklin had not read the manual which was supplied to him; and (4) that there was not sufficient evidence to show negligent construction or assembly of the machine by Allis-Chalmers. In view of these findings, the lower court found it unnecessary to consider whether Shanklin was contributorily negligent or assumed the risk of his injury. In this appeal, Shanklin has abandoned his contention that Allis-Chalmers negligently designed and constructed the forage harvester in question.[2] He does attack the other findings made by the lower court.

Our study of the record below convinces us that the findings of the dis-

---

[1] Shanklin testified that he would not call himself the farm manager but that he did "more or less run the farm for Mr. Phillips because he was away."

[2] In the court below, Shanklin relied on a portion of the testimony of an expert witness called by Allis-Chalmers and on advertising circulars of other manufacturers of farm machinery. A review of these exhibits and the testimony of such witness indicates that Shanklin clearly did not meet his burden of proof on this issue.

trict court are correct. It is therefore not necessary to decide whether such findings of Judge Christie are entitled to less weight than ordinarily required by Rule 52(a), F.R.Civ.P., because another judge saw and heard the witnesses.[3] See Galena Oakes Corp. v. Schofield, 218 F.2d 217 (5th Cir. 1954); Moore's Federal Practice, 2d Ed., ¶ 52.04.

Before reaching the issue of negligent demonstration, the lower court first had to determine whether Greenbrier Tractor Sales was in fact an agent of Allis-Chalmers. It reviewed the provisions of the contract between Greenbrier Tractor and Allis-Chalmers and the other facts in the record and concluded that the former was a special agent of the latter for the limited purpose of instructing Shanklin as to the proper manner of operating the forage harvester. See 3 Am.Jur.2d, Agency, § 6 (1962). In view of the conclusions that we have reached concerning the other issues here presented, we will assume for the purpose of this decision that such finding is correct.

The precise factual question here is whether Arbuckle in September of 1960, while demonstrating the machine, showed Shanklin that the proper way to unclog the harvester was to lift the door of the safety compartment, reach in and pull the corn loose with the power on and the feed rolls rotating. Arbuckle conceded that on occasion while the machine was operating he would pull stalks from the top of the row crop attachment to straighten them out. As there were no feed rolls located at this stage of the corn's journey, there was no safety door to be lifted here. In straightening stalks in the open chute at the top of the row crop attachment, Arbuckle was not exposing his hand and arm to the feed rolls further along.

Shanklin testified that when the machine clogged up during the three-day demonstration in September, 1960, Arbuckle would open the safety door and pull the corn loose, sometimes with the power off and sometimes with it on. Arbuckle, on the other hand, testified that he was quite sure that he did not open the safety door while the machine was running.

The two witnesses called by Shanklin on this issue add little support to his testimony. Ocie M. Eads was not out in the field at the time of the demonstration, but was working some 300 yards away at the silo. He "wasn't paying much attention" but said that it "looked like" the machine was running and that "they" were pulling fodder out of the machine. He did not specify what part of the machine was involved. Edward Allen Vass, another farm worker, testified that during the demonstration he saw corn being pulled out of the machine while it was running, but "what particular part he pulled it out from, or something, I wouldn't know."

In contrast, the testimony of the witnesses called by Allis-Chalmers to support Arbuckle was somewhat stronger. Paul Cruise, who was present in the field during the entire demonstration, testified that he never saw Arbuckle unclog the machine without turning the power off. Elmer Hedrick, Jr., who was present during the first day of the demonstration, also said that Arbuckle turned off the power before unclogging the machine.

Shanklin places strong reliance here on the testimony of Willie Goodson which he claims supports his own testimony that Arbuckle put his hand through the safety door and unclogged the corn. It is argued that the lower court erred in not specifically mentioning Goodson's testimony in its opinion.[4]

---

**3.** Before he decided the case, Judge Christie did have an opportunity to observe a demonstration of the operation of a similar machine.

**4.** In discussing the issue of negligent demonstration, the lower court, after reviewing the testimony of Vass and Eads, noted

that there were other statements and evidence relating to this question, but found that such testimony "would be of no material benefit to plaintiff in establishing this claim by a preponderance of the evidence." 254 F.Supp. at page 228.

We note that Shanklin did not call Goodson as a witness. Goodson was called by Allis-Chalmers solely for the purpose of establishing that Shanklin had been drinking on the morning of the accident.[5] He did not testify as to any of the details of the demonstration. On cross-examination, Shanklin's attorney sought to impeach Goodson by means of a signed statement in which Goodson did not mention such drinking. When confronted with this statement dated July 12, 1962, Goodson admitted that he had signed it, but said that he could not read. The statement was then read into the record, parts of which were confirmed by Goodson and parts of which were denied. In particular, Goodson did not affirm those portions of the statement in which he purportedly said that Arbuckle stuck his hand in the machine and unclogged the corn. Under such circumstances, we conclude that the trial court did not err in giving no credence to those portions of the statement read into the record in an attempt to impeach Goodson on cross-examination.

■ We agree with the lower court that this record does not support Shanklin's contention that Arbuckle demonstrated the unclogging of this machine in such a patently dangerous manner as claimed. Arbuckle was an experienced dealer in farm machinery. At the time of the sale of this harvester, he had sold some 20 such machines and had personally demonstrated 15 of these. He was therefore thoroughly familiar not only with the printed warnings on the machine itself, but also with the obvious fact of the danger inherent in placing one's hand too close to the rotating feed rolls. More proof than has been offered here by Shanklin is necessary to convince us in the face of Arbuckle's supported denials that while instructing a prospective user, this experienced dealer would expose himself to the danger of putting his hand through the safety door so that it was in close proximity to the rolls while the machine was operating.

■ Shanklin next contends that actionable negligence has been established in this record by proof that Arbuckle did not instruct him as to the use of the reverse bar which was provided as a part of the harvester's equipment for reversing the direction of the machine's rolls. It is clear, however, that the reverse bar was not designed to be used to correct the clogging condition that occurred on September 12, 1961. The purpose of the bar was for the removal of rocks or other solid objects which might jam the feed rolls and prevent their movement. Shanklin's own testimony shows that the condition he sought to correct on the day of the accident was the clogging of the corn in front of the still-rotating rolls. Lack of instruction as to the use of the reverse bar could not then have been a cause of this accident, as resort to this tool would have had no effect in correcting the type of clogging encountered by Shanklin shortly before he was injured.

■ Nor could Arbuckle's failure to supply Shanklin with a proper instructional manual have caused these injuries. Shanklin testified that he was aware of the sign on the compartment door warning operators to keep away from the rolls unless the power was off. He likewise admitted that he knew that it was dangerous to work inside the safety compartment with the power on. He therefore had specific knowledge of the safety requirements for working in close proximity to the rolls. Shanklin was supplied with a white, bound manual which he kept in the machine shed with other books on farm machinery but which he now claims was not the proper manual for this particular machine. Whether this

---

5. Goodson testified that there were two bottles of wine located in the car in which Shanklin came to work that morning and that Shanklin was drinking wine on the morning of the accident. In view of its findings that it was unnecessary to consider the defenses of contributory negligence and assumption of risk, the lower court did not discuss whether Shanklin was drinking at the time of his injury, but found it sufficient for the record to say that the evidence supported the conclusion that he was not drinking that day.

book contained proper operating instructions for the particular model forage harvester that Shankin was using is immaterial here, for it is not disputed that Shanklin in any event never looked at the manual in his possession. Under such circumstances, absence of the proper manual did not in any degree contribute to Shanklin's injuries.

In Brown v. General Motors Corporation, 355 F.2d 814 (4th Cir. 1966), Brown, the plaintiff, was injured when Gulley, a fellow employee, reached up at Brown's request and "bumped" the starter button of a bulldozer to rotate the drive shaft so that a fitting could be turned for greasing. As it was dark at the time, Gulley could not see that the machine was then in gear, and it moved back crushing Brown. Some similar machines carried an instrument called a micro-switch which broke the starting circuit except when the gear was in neutral. This particular machine merely had a shield around the starter button so that it could be touched only with some difficulty if the operator reached behind the shield. One of the grounds of negligence alleged was that no adequate warning had been given of the danger arising from the change in the starter appliance from micro-switch to shield. In finding that there was no negligence as a matter of law, this Court said the following at page 819:

> "As the starter button was completely obscured from the driver when the engine was in gear, a glance told the operator that the button should not be pressed when the shield was over it. As Gulley remarked on the stand, 'It's [the shield is] there for a protective cover, so you can't start it. * * *'
>
> "It is obvious that both Brown and Gulley were aware that the tractor *could* be started in gear but that it *should not* be. They were well acquainted with the tractor and how it operated." (Emphasis in original)

Similarly, Shanklin was well acquainted with this forage harvester, and how it operated. He knew that merely by turning off the machine's power, all danger from the rotating feed rolls would be eliminated. In his own words, he candidly stated that the reason he did not cut the power off was "to save time and the trouble that it takes to unstop the forage harvester."

For the reasons stated, we think that the findings made by the lower court were correct, and we affirm its judgment.

Affirmed.