554 So.2d 927 (1989)
Joyce SCHWARTZ and Michael Schwartz
v.
VOLVO NORTH AMERICA CORPORATION and Aktiebolaget Volvo.
87-1272.
Supreme Court of Alabama.
July 28, 1989.
Rehearing Denied November 17, 1989.
James R. Pratt III and R. Ben Hogan III of Hogan, Smith, Alspaugh, Samples & Pratt, Birmingham, for appellants.
De Martenson and D. Alan Thomas of Huie, Fernambucq & Stewart, Birmingham, and Harry Cole of Hill, Hill, Carter, Franco, Cole & Black, Montgomery, for appellees Volvo North America Corp., Aktiebolaget Volvo and Volvo Car Corp.
Arthur H. Bryant, Washington, D.C., for amicus curiae Trial Lawyers for Public Justice, and D. Leon Ashford of Hare, Wynn, Newell & Newton, Birmingham, for amicus curiae Alabama Trial Lawyers Ass'n, in support of appellants.
William H. Crabtree and Edward P. Good, Detroit, Mich., and Charles H. Lockwood II and John T. Whatley, Arlington, Va., and Paul M. Bator, Stephen M. Shapiro, Kenneth S. Geller and Kathryn A. Oberly of Mayer, Brown & Platt, Chicago, Ill., for amici curiae The Product Liability Advisory Council, Inc., The Auto. Importers of America, Inc., and the Motor Vehicle Manufacturers Ass'n of the U.S., Inc.
PER CURIAM.
Plaintiffs, Joyce Schwartz and Michael Schwartz, appeal from the summary judgment entered in favor of Volvo North America Corporation and Aktiebolaget Volvo ("Volvo") on their claim, under the Alabama Extended Manufacturer's Liability Doctrine, that their Volvo automobile was not crashworthy due to Volvo's failure to incorporate into its design a reasonable passive restraint systemspecifically, an air bag.
In December 1986, the Schwartzes sued Eugene Shelton Lowery and Steve Pulliam, alleging that Lowery had negligently operated a vehicle that was involved in an accident with a Volvo automobile owned and, at that time, occupied by the Schwartzes, and alleging that Pulliam had negligently entrusted his automobile to Lowery. The Schwartzes later added Volvo as a defendant, alleging that the automobile's seat belt system was defective; that Volvo was negligent in failing to warn and/or that the automobile was defective because of the absence of reasonable warnings that the seat belt system would not prevent "secondary impacts"[1] due to slackness or *928 looseness of the system; that the automobile was defective and/or that Volvo was negligent because of its failure to incorporate into its design a reasonable passive restraint system to prevent secondary impacts; and that the vehicle was defective and unreasonably dangerous because of a lack of crashworthiness in the hood.
On March 10, 1988, the trial judge entered a partial summary judgment in favor of Volvo, finding that federal law preempts any claim based upon the lack of air bags and prevents the Schwartzes from offering evidence that air bags could have been or should have been incorporated into the design of their automobile.
After a motion was filed to set aside the summary judgment, additional evidence was submitted both in opposition to and in support of the summary judgment. On June 17, 1988, the trial court reaffirmed its summary judgment and made that judgment final pursuant to Rule 54(b), A.R. Civ.P. The June 1988 final judgment appealed from reads:
"Order of March 10, 1988, is reinstated granting defendants, Volvo North America Corporation, a corporation; Aktiebolaget Volvo (AB Volvo), partial summary judgment, as to any claims of plaintiffs based on lack of air bags, and said defendants are dismissed as parties to this action. It is determined by the court that there is no just reason for delay and it is directed that this judgment be entered as a final judgment under the provisions of Rule 54(b), A.R.Civ.P. Any costs incident thereto taxed to plaintiffs." (Emphasis supplied.)
As noted earlier, the trial court's original entry of partial summary judgment was expressly based on the limited ground of Volvo's defense of federal preemption.[2] Our reading of both entries of judgment (March 10 and June 17), however, convinces us that the trial court upheld the plaintiffs' air bag count as a cognizable state claim and then rejected the plaintiffs' right to prosecute that claim because of federal preemption. Indeed, unless the plaintiffs' allegation of liability against Volvo for its failure to install an air bag is a cognizable state claim, the preemption issue is not ripe for consideration. Stated otherwise, for preemption to be a viable issue, the trial court necessarily either decided or assumed that the plaintiffs' statements of their "air bag" claim were based on a recognized state claim.
Because we hold that the plaintiffs' claim based on Volvo's failure to install an air bag in their automobile is not a cognizable state claim, we affirm the partial summary judgment in favor of Volvo insofar as it relates to the "air bag" claim; thus, we pretermit any consideration of the preemption issue. Because our affirmance is limited to the "air bag" claim, to the extent the judgment may relate to any other claim against Volvo, we reverse the judgment and remand the cause.[3]
Our affirmance is compelled by this Court's holding in Dentson v. Eddins & Lee Bus Sales, Inc., 491 So.2d 942 (Ala. 1986). After careful consideration, we reaffirm our holding in Dentson. Even if we were to overrule Dentson (which we do not do here), it would require more than an overruling of that holding (affirming a Rule 12(b)(6), A.R.Civ.P., dismissal of a claim for failure to install seat belts on a school bus) for this Court to recognize a claim for injuries based on an automobile manufacturer's failure to install air bags absent a legislative mandate directing such installation.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
JONES, ALMON, SHORES and HOUSTON, JJ., concur.
*929 STEAGALL and MADDOX, JJ., concur in the result.
HORNSBY, C.J., and ADAMS, J., concur in part and dissent in part.
KENNEDY, J., dissents.
STEAGALL, Justice (concurring in the result).
The majority refuses to reach the question of whether the Schwartzes' air bag claim is preempted by federal law, the only issue briefed and orally argued before this Court, finding instead that the plaintiffs do not state a cognizable claim under Alabama law. While I do not necessarily disagree with the result reached by the majority, I believe that such a claim is preempted by federal law.
The National Traffic and Motor Vehicle Safety Act ("Safety Act"), enacted by Congress in 1966, provides, in pertinent part:
"(a) The Secretary shall establish by order appropriate Federal motor vehicle safety standards. Each such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be stated in objective terms.
"....
"(d) Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard.
"....
"(f) In prescribing standards under this section, the Secretary shall
"(1) consider relevant available motor vehicle safety data, including the results of research, development, testing and evaluation activities conducted pursuant to this chapter;
"(2) consult with the Vehicle Equipment Safety Commission, and such other State or interstate agencies (including legislative committees) as he deems appropriate;
"(3) consider whether any such proposed standard is reasonable, practicable and appropriate for the particular type of motor vehicle or item of motor vehicle equipment for which it is prescribed; and
"(4) consider the extent to which such standards will contribute to carrying out the purposes of this chapter."
14 U.S.C.A. § 1392 (1982). The Safety Act also provides:
"Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law."
15 U.S.C.A. § 1397(c) (1982) (hereinafter referred to as the "saving clause").
The Safety Act authorized "federal motor vehicle safety standards," more commonly referred to as "FMVSS." 15 U.S. C.A. §§ 1391(2), 1392(a) (1982). FMVSS 208 gives automobile manufacturers three options for the protection of front-seat passengers in crashes. The use of any one option would satisfy the requirements of FMVSS 208. These options are:
(1) Passive protection from frontal and angular collisions (air bags only);
(2) Passive protection from head-on collisions, supplemented by seat belts and a belt warning system (air bags and seat belts); or
(3) Lap and shoulder belts, plus a belt warning system (seat belts only).
49 C.F.R. § 572.208 (1982).
On appeal, the Schwartzes argue that, in light of this Court's decision in General Motors Corp. v. Edwards, 482 So.2d 1176 (Ala.1985), and the saving clause, the trial *930 court erred in precluding air bag/passive restraint claims because Congress neither expressly nor impliedly preempted such claims.
In determining whether the Schwartzes' claim is preempted by federal law, we are required to look at the intent of Congress. A cause of action is expressly preempted when Congress states that state law is preempted, when the action of Congress shows an intent to occupy a given field, or if state law actually conflicts with the federal law. See Michigan Canners & Freezers Ass'n, Inc. v. Agricultural Marketing & Bargaining Bd., 467 U.S. 461, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984); accord, International Paper Co. v. Ouellette, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987). A cause of action may be impliedly preempted "where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300, 108 S.Ct. 1145, 1151, 99 L.Ed.2d 316 (1988) (citing Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).
In Edwards, this Court stated that "[w]hether federal standards should be conclusive [and therefore `preemptive'] in `crashworthiness' cases is not a decision for this Court to make. Such a decision, if made, would have to be made by the appropriate legislative body." 482 So.2d at 1198 (emphasis added). In the field of "air bag" regulation, Congress has acted and delegated to the National Highway Traffic Safety Administration ("NHTSA") the authority to regulate "air bags," and NHTSA has set up the three options for compliance under FMVSS 208.
We further clarified this position in Dentson v. Eddins & Lee Bus Sales, Inc., 491 So.2d 942 (Ala.1986). In that case, the question raised was whether a manufacturer of a bus used for "transportation of pupils" was required by Alabama law to install passenger seat belts in the vehicle. In addressing this issue, we looked at the intent of the Alabama legislature and found that "the legislature impliedly excluded the passenger seat belt as a necessary item on Alabama school buses." 491 So.2d at 944. In Dentson, as in the instant case, plaintiffs argued that our holding in Edwards would not preclude a finding that a vehicle was defective under the Safety Act. We stated in that particular case, however, that the intent of the Alabama legislature was conclusive that "a school bus in Alabama may not be found defective for purposes of the AEMLD...." 491 So.2d at 944. Likewise, here the appropriate legislative body, in this case Congress, intended that the federal standards enacted to protect front-seat passengers in crashes are conclusive in this area.
Based on the extensive legislative history,[1] it is clear that Congress was aware of the advantages presented by air bag installation in automobiles. Congress was, likewise, aware of the disadvantages associated with their installation, primarily the cost of installation and a lack of public support in connection with air bag reliability as well as other potential hazards to occupants.
"All of these arguments have been presented to Congress and the Department of Transportation and yet the Department has specifically chosen not to make air bags mandatory. Not only that, 15 U.S.C.A. § 1410b prohibits the Department of Transportation from requiring air bags without prior congressional approval. See 15 U.S.C.A. § 1410(b)-(d). Congress has chosen to give manufacturers a choice of occupant restraint systems. A court decision creating common law liability for the failure to install air bags
"`will effectively force automobile manufacturers to choose the air bag option over other statutorily approved options. An automobile manufacturer faced with the prospect of choosing the air bag option, or facing potential exposure to compensatory and punitive damages for failing to do so, has but one realistic choice. A court decision *931 that removes the element of choice authorized in the occupant crash safety regulations will frustrate the statutory scheme.'

"Baird v. General Motors Corp., 654 F.Supp. 28, 32 (N.D.Ohio 1986) (emphasis added). In Baird, the court found that air bag claims were impliedly preempted."
Wickstrom v. Maplewood Toyota, Inc., 416 N.W.2d 838, 841 (Minn.App.1987), cert. denied, ___ U.S. ___, 108 S.Ct. 2905, 101 L.Ed.2d 937 (1988).
The Schwartzes also contend that the saving clause preserves all common law claims and, therefore, their air bag claim as well. In Wood v. General Motors Corp., 865 F.2d 395 (1st Cir.1988), the First Circuit Court of Appeals discusses the state of the common law in 1966 concerning products liability and actions similar to the one now before this Court. In discussing the saving clause, that court stated:
"We conclude that it is unrealistic to ascribe to the authors of the Safety Act, and to Congress generally, an awareness that in the years ahead a new breed of state tort actions would be developed from which design standards might emerge that, on some rare occasion, might create a direct conflict with a particular FMVSS. Thus when Congress inserted the savings clause, it did not contemplate that lawsuits would be brought with the potential to give rise to the current dilemma."
865 F.2d at 406.
This Court has expressed a similar view concerning actions based on the "crashworthiness" of automobiles. In Edwards, this Court stated:
"The `crashworthiness doctrine,' which is also referred to as the `second collision doctrine' or the `enhanced injury doctrine,' is a recent development in the area of products liability law, so recent, in fact, that prior to 1968 a case of this nature would likely have been subject to dismissal for failure to state a claim upon which relief could be granted."
482 So.2d at 1181.
The Supreme Court has held that general saving clauses, like this one, will not preserve common law claims where the "result would be a serious interference with the achievement of the `full purposes and objectives of Congress.'" International Paper Co. v. Ouellette, 479 U.S. at 493-94, 107 S.Ct. at 812 (citations omitted). Such saving clauses are "added at the end of the statute,not to nullify other parts of the Act, or to defeat rights or remedies given by preceding sections,but to preserve all existing rights which were not inconsistent with those created by statute." Pennsylvania R.R. v. Puritan Coal Mining Co., 237 U.S. 121, 129, 35 S.Ct. 484, 487, 59 L.Ed. 867 (1915) (emphasis added). The clear meaning of the saving clause is that compliance with any safety standard issued under the Safety Act will not exempt any person from any liability under the common law as it existed at the time of the Safety Act's passage. Therefore, because this Court has already concluded that this cause of action did not exist at the time of the Safety Act's passage, and because a contrary holding would frustrate the full purposes and objectives of Congress, the saving clause will not preserve the Schwartzes' air bag claim.
Based on the foregoing, I believe the Schwartzes' claim against Volvo, alleging, under the AEMLD, that their Volvo automobile was not crashworthy because it lacked air bags, is preempted by the federal statute.
MADDOX, J., concurs.
HORNSBY, Chief Justice (concurring in part and dissenting in part).
I concur in the plurality opinion insofar as the seatbelt and hood claims are concerned. I am not absolutely certain what the holding of the majority with respect to the air bag claim is; if I extrapolate accurately, however, then I am certain that I do not agree with it.
First, the parties, virtually to the exclusion of all else, have argued the preemption issue, yet the plurality opinion inexplicably rejects those arguments, and the reasoning *932 of the trial court, and "pretermit[s] any consideration of the preemption issue." This case is of monumental national importance and involves a question of federal, not state, law; what the majority effectively "pretermits" is any chance of review by the Supreme Court of the United States that the parties might have had.
Second, the excellent briefs submitted by the parties and by amici curiae reveal that every opinion, published and unpublished, issued by the courts in the context of "air bag litigation," is rested on a preemption analysis, i.e., an analysis of the preemptive effect of the federal safety standards. That suggests to me that the plurality opinion, resting the analysis on state law, is wrong, if not unreasonably aberrant.
Next, the plurality opinion holds "that the plaintiffs' [air bag] claim ... is not a cognizable state claim." Why not? In 1976, this Court adopted the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") and has adhered to it since: "[A] manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, [commits] negligence as a matter of law." Casrell v. Altec Indus., Inc., 335 So.2d 128, 132 (Ala. 1976) (emphasis in original); accord Atkins v. American Motors Corp., 335 So.2d 134, 139, 141 (Ala.1976). The claim, then, contrary to the words of the plurality opinion is most assuredly a cognizable claim. Cf. Taylor v. General Motors Corp., 875 F.2d 816 (11th Cir.1989) (automobile manufacturer's failure to equip automobile with air bag presented cognizable claim under Florida law). I recall also our holding in Caterpillar Tractor Co. v. Ford, 406 So.2d 854 (Ala.1981), a case wherein we upheld a judgment based on a jury verdict against a manufacturer for its failure to include a roll bar on the tractor on which the plaintiff's decedent was killed during a roll-over:
"Caterpillar argues that it is unjust to hold it responsible for not installing the [roll bar] when [roll bars] were offered as optional equipment. We cannot agree. If the tractor was defective in the condition in which it was sold, liability for [the] resulting injury cannot be escaped by showing that the customer could have but did not buy an item which would have removed the defect."
Id. at 857.
Given that the claim is cognizable, I can not presume that the opinion of the Court is intended to say that the defendants, as a matter of law, breached no duty owed to the plaintiffs. Assuming a duty is owed, whether it has been breached is always a question for the jury. Therefore, I will not presume that the majority is denying the plaintiffs their fundamental right to a jury trial. Const. of 1901, art. I, § 11. And, of course, the majority well knows that the question of whether a defect exists and the question of whether the product is state-of-the-art are jury questions. Caterpillar Tractor Co., supra, 406 So.2d at 858 ("[w]hether the omission of some roll-over protective device on the [tractor] rendered it defective or unreasonably dangerous when put to its intended use was the very issue before the jury" and "[t]he jury could have found under the evidence that the state of the art at the time the tractor here was sold dictated the inclusion of some kind of protective roll-over device") (emphasis added).
What the majority must mean is that the defendants owed the plaintiffs no duty as a matter of law, or, in other words, that the restraint system employed by the defendants was absolutely as safe as the law could require. Dentson v. Eddins & Lee Bus Sales, Inc., 491 So.2d 942 (Ala.1986), does not "compel" such a holding. In Dentson, we stated:
"We emphasize that our holding today is very narrow and applies only to this particular, and perhaps even peculiar, fact situation. Nothing in this opinion should be construed to conflict with our holding in General Motors [Corp. v. Edwards, 482 So.2d 1176 (Ala.1985) ] or other caselaw in this state in the area of products liability."
491 So.2d at 944. (Emphasis added.) Dentson involved the establishment vel non of a duty to install seat belts in school buses under the terms of a state statute; *933 General Motors Corp. v. Edwards, on the other hand, involved the effect of compliance with federal safety standards on the manufacturer's liability. Dentson was not "compelled" by General Motors Corp. v. Edwards, 482 So.2d 1176 (Ala.1985), and this case is not compelled by Dentson. This case involves federal safety standards as they relate to the design of reasonably crashworthy vehicles. Furthermore, in Dentson, we stated the obvious: "Our duty, of course, is to determine legislative intent," Dentson, 491 So.2d at 943, and, in that case, we then did so. In the case at bar, however, the majority, despite the holding being "compelled" by Dentson, refuses to even consider legislative intent.
I conclude, therefore (or nevertheless), that without admitting it has done so, the majority has found the air bag claim impliedly preempted. The unspoken holding of the Court is that, because the defendants complied with Congressionally established minimum safety standards, as a matter of law the defendants owed no duty to the plaintiffs to design an automobile any safer. With that in mind, I will proceed.
I caution the reader at the outset that the issue presented is fraught with side roads that invite exploration and details that invite examination. In spite of that, I will endeavor to articulate as clearly as possible my views, without sacrificing the thorough analysis demanded by this case.
My preface would likewise be incomplete lest I forthrightly concede that a mountain of case authority addressing preemption in the field of air bag litigation stands directly against me. Indeed, I find no reported cases in precise accord with my opinion. Nevertheless, because I am convinced that the claims pressed by the Schwartzes are not preempted, I proceed undeterred.

I. Statutory Provisions Involved
The trial court entered a summary judgment against the Schwartzes on the ground that their claims are preempted by the National Traffic and Motor Vehicle Safety Act ("Act"), 15 U.S.C. § 1381 et seq., and the Federal Motor Vehicle Safety Standards ("FMVSS") promulgated under the Act, specifically FMVSS 208, codified at 49 C.F.R. § 571.208 (1987).
The first section of the Act, entitled "Congressional Declaration of Purpose," sets forth the purpose of the Act: "Congress hereby declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." 15 U.S.C. § 1381. The authorities are in agreement that, in passing the Act, the primary objective of Congress was to promote safety. E.g., Wood v. General Motors Corp., 865 F.2d 395 (1st Cir.1988); Chrysler Corp. v. Tofany, 419 F.2d 499, 508-10 (2d Cir.1969); Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir.1968); Richart v. Ford Motor Co., 681 F.Supp. 1462, 1469 (D.N.M.1988); Garrett v. Ford Motor Co., 684 F.Supp. 407 (D.Md.1987); Arbet v. Gussarson, 66 Wis.2d 551, 225 N.W.2d 431 (1975). The legislative history buttresses this reading, see, e.g., S.Rep. No. 1301, 89th Cong., 2d Sess. 4, reprinted in 1966 U.S.Code Cong. & Admin.News 2709 (hereinafter "Senate Report"), as do the commentators. See generally Miller, Deflating the Airbag Preemption Controversy, 37 Emory L.J. 897 (1988) (hereinafter "Airbag Preemption Controversy"); Comment, Federal Preemption: Car Maker's Cushion Against Air Bag Claims? 27 Duq.L.Rev. 299 (1989).
As a subordinate purpose, Congress sought to achieve uniformity in the standards by which automobile manufacturers are governed. See, e.g., Wood v. General Motors Corp., supra; Cox v. Baltimore County, 646 F.Supp. 761, 764 (D.Md.1986); Airbag Preemption Controversy, supra, at 930-37. The legislative history tends to confirm this view. "The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country." Senate Report, supra, 1966 U.S.Code Cong. & Admin.News at 2720.
It is this concern for uniform standards that automobile manufacturers argue *934 breathes life into the "preemption clause" of the Act. That clause provides:
"Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no state or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard. Nothing in this section shall be construed to prevent the Federal Government or the government of any State or political subdivision thereof from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard."
15 U.S.C. § 1392(d). "Basically, this preemption subsection is intended to result in uniformity of standards so that the public as well as the industry will be guided by one set of criteria rather than a multiplicity of diverse standards." H.Rep. No. 1776, 89th Cong.2d Sess. 17 (1966), U.S.Code Cong. & Admin.News 1966, p. 2709.
The standard involved in this case, as noted above, is FMVSS 208. That standards permits manufacturers the choice of complying with any one of three options: 1) a complete passive protection system, either automatic seat belts or air bags (see 49 C.F.R. § 571.208 (S4.1.2.1) (1987)); 2) a combination air bag and seat belt system (see id. at § 571.208 (S4.1.2.2)); or 3) a lap and shoulder belt with a warning system (see id. at § 571.208 (S4.1.2.3)). The defendant in the case at bar employed the latter method, that consistently chosen by automobile manufacturers. Because it complied with Standard 208, the defendant argues, it may avail itself of the "preemption clause."[1]
The plaintiffs, on the other hand, point to the "saving clause." That clause provides:
"Compliance with any Federal motor vehicle safety standard issued under this subchapter does not exempt any person from any liability under common law."
15 U.S.C. § 1397(c). Obviously, the same common law claim can not be preserved and preempted at the same time. The task at hand, therefore, is to divine what Congress meant.

II. Plain Language of the Statutes
In trying to determine whether a certain type of state activity is preempted, the "sole task is to ascertain the intent of Congress." California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). "The starting point in every case involving construction of a statute is the language itself." Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975); see Watt v. Alaska, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). Furthermore, when a statute is clear on its face, courts should be truly reluctant to enter the often foggy area of the statute's legislative history. Blum v. Stenson, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547-48, 79 L.Ed.2d 891 (1984); Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978); Piper v. Chris-Craft *935 Indus., Inc., 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977).
Section 1397(c), the saving clause, could hardly be more sweeping. That section unequivocally provides that compliance with any federal safety standard does not exempt any person from any liability under common law. That language is absolutely clear on its face, and, in my opinion, must be taken to mean what it says.
Section 1392(d), the preemption clause, on the other hand, is silent about common law liability. If Congress meant to preempt common law liability, it certainly could have done so in a clear manner. See, e.g., 29 U.S.C. § 1144(a), (c)(1) (clear statement of preemption of all laws and decisions under ERISA); 17 U.S.C. § 301(a) (clear statement of preemption under Copyright Act of 1976).
In my opinion, the analysis should end here. Section 1397(c) clearly states that compliance with a Federal safety standard does not exonerate any person from any liability, and § 1392(d) does not clearly contradict that.
In my mind, a contrary reading renders the saving clause meaningless. As Professor Miller summarizes, "The savings clause, it is argued, represents Congress'[s] intent that compliance with Federal safety standards does not protect automobile manufacturers from liability for defects relating to matters not covered by the federal standards." Airbag Preemption Controversy, supra, at 915 (citing Hughes v. Ford Motor Co., 677 F.Supp. 76, 78 (D.Conn. 1987); Cox v. Baltimore County, supra; and Wickstrom v. Maplewood Toyota, Inc., 416 N.W.2d 838, 840 (Minn.App.1987), cert. denied, ___ U.S. ___, 108 S.Ct. 2905, 101 L.Ed.2d 937 (1988)). The argument continues that "[w]ithout the savings clause, a state could not hold a manufacturer liable if the manufacturer had complied with federal standards even if the defect involved was not covered by an applicable federal standard." Id. The first part of such an argument says nothing, and the second belies common sense.
First of all, if the saving clause is said to touch only matters not covered by the federal safety standards, then its passage was unnecessary in the first instance. If no safety standards were applicable to a given case, then how could the Act even apply? If Congress itself, or an agency to which Congress lends its regulatory pen, has not spoken, surely a manufacturer can not defend on the grounds that because Congress has required nothing, then the common law can not do so either. For example, suppose a plaintiff could prove that he was injured as the proximate result of an automobile manufacturer's failure to install a seat of sufficient weight, a topic (to my knowledge) not addressed by federal law or regulations. How can the lack of regulations addressing seat weight be a defense to the plaintiff's common law cause of action? Obviously, it can not. The function of the common law is to fill the interstices left by legislatures. No statute need be enacted to say as much, and I can not ascribe to Congress such a meaningless purpose regarding § 1397(c).
Second, even if a manufacturer has complied with all applicable safety standards, to argue that it can not be held liable for a defect that no safety standard governs is nonsensical. To my knowledge, no regulation promulgated under the authority of the Act addresses permissible chemical compositions of automobile dashboards. If a particular dashboard emitted a noxious or toxic fume that caused injury, however, would any court point to the Act and bar recovery? Of course not; if the plaintiff proved his case, he would recover. The absence of a regulation on point would serve as a defense in no court.
The saving clause of the Act was not passed to accomplish anything as painfully obvious as permitting the common law to operate where Congress had not spoken to the contrary. Such would amount to frivolous and useless legislating, something the mass of legislative history supporting the Act and the weight of regulations promulgated pursuant to the Act belie.
But would this reading of the saving clause render the preemption clause without meaning? In short, the answer is no. In the context of this case, for example, a *936 properly instructed jury could conclude that a combination air bag and seat belt system would have been safer than, and would have prevented the plaintiffs' injury better than, the lap and shoulder belt with warning system employed by Volvo. In that circumstance, Volvo could have avoided liability (and would avoid future liability) by complying with the regulation in an alternative fashion. Moreover, no argument about a non-identical state standard, as proscribed by the preemption clause, would be available.
In the preceding paragraphs, I have attempted to demonstrate that the saving clause and the preemption clause can be reconciled on a plain reading of the words chosen by Congress. This result obtains without wading into the legislative history and without the disfavored resort to preemption analysis.

III. "Anti-Preemption"
Three federal appellate courts have considered the preemptive effect of § 1392(d) in the field of air bag litigation. In Wood v. General Motors Corp., supra, the First Circuit concluded that common law claims were not expressly preempted by § 1392(d). Accord, Taylor v. General Motors Corp., 875 F.2d 816 (11th Cir.1989); Kitts v. General Motors Corp., 875 F.2d 787 (10th Cir. 1989). I agree with that conclusion.
My analysis beyond that point differs from that of those courts, however. I see no need to undertake an implied preemption analysis, first, due to the plain wording of the statutes here reviewed, and, second, due to the fact that § 1397(c) is an "anti-preemption" provision that militates not only against a finding of implied preemption, but also against undertaking the implied preemption analysis in the first place. This "anti-preemption" provision "obviates the need for and, if implied preemption is found, refutes the results of an implied preemption analysis." Comment, supra, 27 Duq.L.Rev. at 305.
In California Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987), the Supreme Court reviewed a portion of the Coastal Zone Management Act ("CZMA"), argued by the respondent mining operation to preempt California's authority to regulate it when the respondent was mining on federally owned land. "Because Congress specifically disclaimed any intention to pre-empt preexisting state authority in the CZMA, we conclude that ... the CZMA does not automatically preempt all state regulation of activities on federal lands."[2]Id. at 593, 107 S.Ct. at 1431. In my view, Congress, in enacting § 1397(c), "specifically disclaimed any intention to preempt" common law causes of action, at least to the extent that such causes of action could succeed and leave alternative compliance with Standard 208 a complete defense to future causes of action.
In California Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987), the Supreme Court considered the preemptive effect of § 708 of Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e-7. That section, similar to the one under review today, provides:
"Nothing in this title shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this title."
A woman employed by California Federal took a pregnancy leave; a California statute required employers to provide such leave and to reinstate employees disabled by pregnancy. Upon her return to work, the woman was told that her position had been filled. She filed a complaint under the state statute with a state agency; prior to a hearing there, California Federal sought a judgment in federal court declaring the state statute preempted by Title VII. A plurality of the Supreme Court, *937 upon a reading of the plain language of § 708, supra, and § 1104 of Title XI (42 U.S.C. § 2000h-4), stated, "[T]here is no need to infer congressional intent to pre-empt state laws from the substantive provisions of Title VII; these two sections provide a `reliable indicium of congressional intent with respect to state authority' to regulate employment practice." California Federal, 479 U.S. at 282, 107 S.Ct. at 690 (quoting Malone v. White Motor Corp., 435 U.S. 497, 505, 98 S.Ct. 1185, 1190, 55 L.Ed.2d 443 (1978)). Justice Scalia referred to §§ 708 and 1104 as "more precisely antipre-emption provisions," id. 479 U.S. at 295, 107 S.Ct. at 697 (Scalia, J., concurring) (emphasis in original), and concluded that the Court need resort only to § 708 for its holding. See also Barry v. St. Paul Fire & Marine Ins. Co., 555 F.2d 3, 6 (1st Cir. 1977) (refusing to find preemption where McCarran-Ferguson Act contained "reverse preemption" clause), aff'd, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978); SED, Inc. v. City of Dayton, 519 F.Supp. 979, 990 (S.D.Ohio 1981) (refusing to find preemption in the Toxic Substances Control Act where reverse preemption clause was present).
In the Act before this Court today, Congress has, in § 1397(c), provided a clear and reliable indicium that it intended the Act to have an anti-preemptive effect. If Congress wished otherwise, it undoubtedly would have said so. Consequently, common law claims should not be preempted by § 1392(d).

IV. Presumption against Preemption
There is yet another consideration militating against embarking on an implied preemption analysis: the presumption against preemption. The Supreme Court has clearly mandated that "preemption of state law by Federal statute or regulation is not favored `in the absence of pervasive reasonseither that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained.'" Commonwealth Edison Co. v. Montana, 453 U.S. 609, 634, 101 S.Ct. 2946, 2962, 69 L.Ed.2d 884 (1981) (quoting Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981)). There is a presumption "that Congress did not intend to displace state law." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981).
"[W]e start with the assumption that the historic police powers of the states were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elev. Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). As the Ninth Circuit teaches in Chevron U.S.A., Inc. v. Hammond, 726 F.2d 483, 488 (9th Cir.1984), cert. denied sub nom. Chevron U.S.A., Inc. v. Sheffield, 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985):
"The justification for such caution is that Congress certainly has the power to `act so unequivocally as to make it clear that it intends no regulation but its own.' Rice, 331 U.S. at 236[, 67 S.Ct. at 1155]. Furthermore, if we are left with a doubt as to congressional purpose, we should be slow to find preemption, `[f]or the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the burden.' Penn Dairies v. Milk Control Comm'n, 318 U.S. 261, 275[, 63 S.Ct. 617, 624, 87 L.Ed. 748] (1943)."
This presumption against preemption applies as well to protect state common law in areas "traditionally regarded as within the scope of state superintendence." Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 144, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963). Moreover, the presumption against preemption is particularly acute when the federal scheme is purported to displace state and local regulation of matters related to health and safety. Hillsborough County v. Automated Med. Laboratories, 471 U.S. 707, 715, 105 S.Ct. 2371, 2376, 85 L.Ed.2d 714 (1985).
Section 1397(c) of the Act, the saving clause, strengthens the presumption against preemption in the instant case. Further bolstering the presumption is the title of the saving clause: "Continuation of *938 Common Law Liability." It is a well-settled canon of statutory interpretation and construction that the title of a statute has bearing on the meaning of the statute. Sutherland, Statutory Construction § 47.03 (N. Singer 4th ed. 1984) ("[w]here the title throws light on the meaning of the statute itself, it is an available tool for the resolution of doubt"). Unless this presumption against preemption is overcome, the implied preemption analysis need not be undertaken.
As stated earlier, § 1392(d), the preemption clause is hardly a model of clarity with regard to what, if anything, it preempts. Insofar as it is pertinent, the title of that statute is "Supremacy of Federal Standards." That title is little more than a restatement of the Supremacy Clause, and neither the title nor the statute makes it clear that the enactment of federal standards was intended to exclude or to preempt common law causes of action.
Again, then, in my view, the Court should not undertake an implied preemption analysis. The preemption clause is too vague to overcome the presumption against preemption created by the Supreme Court and evident in this case from the saving clause.

V. Types of Preemption, Generally
Nevertheless, it is now incumbent upon me to undertake a preemption analysis so that I fully address the holding of the majority. A brief outline of the several theories of preemption is thus necessary as a backdrop.
Essentially, there are two broad categories of preemption: express and implied. The first, express preemption, exists in either of two ways. Congress may either clearly articulate that state law is preempted, e.g., Jones v. Rath Packing Co., 430 U.S. 519, 530-31, 97 S.Ct. 1305, 1312, 51 L.Ed.2d 604 (1977), or,
"[a]bsent explicit pre-emptive language, Congress' intent to supersede state law altogether may be found from a `"scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose."'"
Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 203-04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983) (citations omitted). In the case at bar, even the preemption clause itself makes it clear that the states are left with some freedom to regulate in the field. I therefore agree with the opinion of the First Circuit in Wood v. General Motors Corp., supra, that common law causes of action are not expressly preempted by § 1392(d). Consequently, I will address the express preemption argument no further.
Implied preemption, on the other hand, obtains where state law and federal law actually conflict. Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). This "actual conflict" arises either where simultaneous compliance with both state and federal law is impossible, Florida Lime, supra, 373 U.S. at 142-43, 83 S.Ct. at 1217-18, or where state law stands as an obstacle to accomplishment of the federal purpose. Silkwood, supra, 464 U.S. at 248, 104 S.Ct. at 621; Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).[3] Furthermore, in order to justify a finding of implied preemption, the actual conflict must be a "sharp" conflict. Boyle v. United *939 Tech. Corp., 487 U.S. 500, 108 S.Ct. 2510, 2515, 101 L.Ed.2d 442 (1988). "The existence of a hypothetical or potential conflict is insufficient to warrant preemption of the state [law]. A state [law] is not preempted by the federal ... laws simply because in a hypothetical situation ... the state scheme might have an anticompetitive effect." Rice v. Norman Williams Co., 458 U.S. 654, 659, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042 (1982).

VI. Implied Preemption: Impossibility of Simultaneous Compliance with Both State and Federal Law
Florida Lime & Avocado Growers disposes of the impossibility-type of implied preemption here. In that case, the Supreme Court provided a lucid example of the impossibility principle: "[I]f, for example, the federal orders forbade the picking and marketing of any avocado testing more than 7% oil, while the California test excluded from the State any avocado measuring less than 8% oil content," then physical impossibility of simultaneous compliance would exist. Florida Lime & Avocado Growers, supra, 373 U.S. at 143, 83 S.Ct. at 1218.
Such an example is not the case before us today. First, a properly instructed jury could conclude that the subject automobile was defectively designed in that it did not contain a seat belt and an air bag. If the jury reached that conclusion, Volvo could comply with State common law, by satisfying the jury's award of monetary damages, and with federal law, by implementing the seat belt and air bag combination permitted by Standard 208. Second, the fact that a defendant must pay damages as the result of a jury verdict does not make it impossible for it to comply with pertinent federal regulations; arguably, this result might, in some instance, frustrate the purposes of the federal law (but see section VII, infra), but it does not make simultaneous compliance with state and federal law physically impossible. Doing one would not prevent Volvo from doing the other.

VII. Implied Preemption: Frustration of Federal Purpose
Several preliminary matters demand attention before I embark on a thorough implied-preemption analysis. Because the plurality opinion, as I understand what its opinion must stand for, holds that common law liability in air bag litigation would frustrate the federal purpose, this section of my opinion is the most extensive.
First, many courts have cited § 1397(c), the saving clause of the Act, and then have held that compliance with federal safety standards does not exonerate an automobile manufacturer from liability. See, e.g., Shipp v. General Motors Corp., 750 F.2d 418, 421 (5th Cir.1985) (where injury was caused by collapse of automobile's roof, fact that manufacturer complied with the only safety standard pertinent did not preclude plaintiff's recovery); Sours v. General Motors Corp., 717 F.2d 1511, 1516-17 (6th Cir.1983) (alleged compliance with FMVSS 216, promulgated after subject automobile was manufactured, not a defense); Dorsey v. Honda Motor Co., 655 F.2d 650, 656-57 (5th Cir.1981), cert. denied, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982) (although manufacturer complied with FMVSS 209 and FMVSS 210, and subjects of those regulations were in part responsible for injury, compliance not a defense); Dawson v. Chrysler Corp., 630 F.2d 950, 958 (3d Cir.1980), (fact that automobile was designed in compliance with all federal safety standards not a defense); cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). Stonehocker v. General Motors Corp., 587 F.2d 151, 156-57 (4th Cir.1978) (alleged compliance with FMVSS 216, promulgated after subject automobile was manufactured, not a defense); Chrysler Corp. v. Department of Transp., 472 F.2d 659, 670 n. 13 (6th Cir. 1972); Roberts v. May, 41 Colo.App. 82, 583 P.2d 305, 308 (1978) (fact that automobile was designed in compliance with all federal safety standards not a defense); Volkswagen of America, Inc. v. Young, 272 Md. 201, 321 A.2d 737, 746 (1974); H.P. Hood & Sons, Inc. v. Ford Motor Co., 370 Mass. 69, 345 N.E.2d 683, 688 (1976); McMullen v. Volkswagen, Inc., 274 Or. 83, 545 P.2d 117, 120 & n. 5 (1976); Turner v. General Motors Corp., 514 S.W.2d 497, *940 505-06 (Tex.Civ.App.1974); Arbet v. Gussarson, 66 Wis.2d 551, 225 N.W.2d 431, 438 (1975). In Shipp v. General Motors Corp., supra, for example, the plaintiff was injured when the roof of a car collapsed due to an alleged defect. Citing the saving clause of the Act, § 1397(c), the court rejected the General Motors argument that compliance with the only safety standard relating to roof strength, FMVSS 216, precluded the plaintiff's cause of action. Such compliance with "minimum safety standards does not exempt or immunize a manufacturer from common law strict liability." Shipp, 750 F.2d at 418. I see no reason why compliance with FMVSS 208 permits preemption of the plaintiff's common law strict liability claims in the case at bar, when the vast, if not complete, weight of decisions in non-air bag cases have held that compliance with directly and exclusively applicable federal safety standards is no defense.
Second, a majority of the sampling in the preceding listing of cases rejecting the argument that § 1392(d) preempts common law causes of action was decided prior to 1982. Yet in 1982, Congress amended § 1392(d), not to clarify its preemptive effect, but to permit states to enforce safety standards identical to federal standards. Congress is presumed to know of the courts' interpretations of its law. "[A] cause of action is itself evidence that Congress affirmatively intended to preserve that remedy." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 381-82, 102 S.Ct. 1825, 1841, 72 L.Ed.2d 182 (1982). Furthermore, when Congress reenacts a statute, albeit amended in nonpertinent part insofar as this case is concerned, as it did in 1982 with the preemption clause, it is presumed to be aware of and to incorporate judicial interpretation of that statute. Albemarle Paper Co. v. Moody, 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975); accord, Lorillard v. Pons, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). Congress, then, must have been aware of the courts' holdings that § 1392(d) did not preempt common law causes of action despite automobile manufacturers' compliance with safety standards; if such holdings did not truly reflect the intent of Congress, Congress would have modified or clarified the preemption clause. Lorillard v. Pons, supra.
Third, without admitting it has done so, the Court today overrules General Motors Corp. v. Edwards, 482 So.2d 1176 (Ala. 1985), and does so without citing it. In Edwards, the seven Justices who took part in the decision adopted the following as law:
"Finally, we note that federal safety standards such as the National Traffic and Motor Vehicle Safety Act of 1966, and the regulations promulgated pursuant thereto, do not preempt or prohibit suits, like the present one, brought in state court under common law causes of action. In fact, proof of compliance with federal highway safety standards, while it may be admitted as evidence that a vehicle is not defective, is not conclusive and, therefore, does not provide a defense to state law claims.... We could hold that the standards set by the federal government, which has the resources necessary to conduct tests to determine whether or not a design is unreasonably dangerous, are conclusive. We refuse to so hold. Whether federal standards should be conclusive in `crashworthiness' cases is not a decision for this Court to make. Such a decision, if made, would have to be made by the appropriate legislative body."
Id. at 1198 (emphasis added). I see no compelling reason simply to throw away such recent and thoroughly-analyzed precedent, especially without a frontal confrontation and the sifting analysis that the overruling of cases should demand. And, significantly, the Edwards decision brought no reaction from Congress.[4]
*941 All three of those "preliminary matters" in the preceding paragraphs suggest to me that Congress does not view its purpose as being frustrated. If Congress is of that mind, the Court should not so lightly embark on the journey the plurality opinion takes today. Nevertheless, although the ship has left, I must remain ashore and point out that its pilot has taken the wrong chart.
In order to determine whether common law causes of action are impliedly preempted, a court must carefully consider § 1397(c), the saving clause. To repeat, that section provides that "[c]ompliance with any Federal Motor Vehicle Safety Standard issued under this subchapter does not exempt any person from any liability under common law." There are also repeated references in the legislative history of § 1397(c) to the common law. E.g., Senate Report, supra, U.S.Code Cong. & Admin.News at 2720 ("State common law standards of care"); H. Rep. No. 1776 89th Cong., 2d Sess. 24 ("rights of parties under common law, particularly those relating to warranty, contract, and tort liability"); 112 Cong.Rec. 19,663 (1966) ("we have preserved every single common-law remedy") (remarks of Rep. Dingell); 112 Cong.Rec. 14,230 (1966) ("broad liability at the common law"; "common law on product liability") (remarks of Sen. Magnuson).
In Wood v. General Motors Corp., 865 F.2d 395 (1st Cir.1988), the First Circuit concluded that negligent design cases were not on Congress's mind in 1966 when it enacted the Act, and that had Congress foreseen that type of litigation, it would have chosen its words more precisely to prevent it. That court concluded that what Congress sought to preserve were cases arising from the common law involving either the negligent operation of motor vehicles or the negligent manufacturing of vehicles.[5]
But that rationale can not be right. Negligent operation of vehicles is not the subject of the Act, nor does the Act or its regulations attempt to regulate the behavior of the motoring public, nor does the Act authorize fines against drivers for erratic practices under the Act, nor would any driver be able to comply with what the Act requires; the Act regulates manufacturers, not consumers. As to manufacturing defects, an automobile incorporating a manufacturing defect that left the manufacturer in compliance with the Act, in spite of the defect, would be such an extraordinarily rare happening that I simply can not believe that that was what Congress contemplated.
Furthermore, my review of the law convinces me that negligent design cases were, in fact, part of the common law by 1966. Accord Taylor v. General Motors Corp., 875 F.2d 816 (11th Cir.1989). In one of the earlier, and certainly the most famous, cases involving the liability of automobile manufacturers, Judge Cardozo wrote for the Court of Appeals of New York:
"If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger.... If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."
MacPherson v. Buick Motor Co., 217 N.Y. 382, 389, 111 N.E. 1050, 1053 (1916). MacPherson involved a manufacturing defect; nonetheless, it brought automobiles into the arena of products liability litigation.
One well-respected scholar wrote in 1956 that "[m]anufacturers have been held liable for injuries caused by vehicles sold with a wide array of defects. Where the alleged defect was of design rather than construction, however, the courts have long seemed reluctant to impose liability on the manufacturer." H. Katz, Liability of Automobile *942 Manufacturers for Unsafe Design of Passenger Cars, 69 Harv.L.Rev. 863, 863 (1956). Reluctant though courts might have been to recognize liability, or potential liability, for negligent design, however, that very tort already had an approved history by the time Katz wrote his article. See, e.g., Carpini v. Pittsburgh & Weirton Bus Co., 216 F.2d 404 (3d Cir.1954) (affirming judgment based on jury verdict in favor of plaintiff injured due to negligent design of bus braking system); Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467 (3d Cir.1950) (reversing because trial court refused to allow evidence tending to show that shape of gas storage tank was a factor of its negligent design); Northwest Airlines, Inc. v. Glenn L. Martin Co., 224 F.2d 120 (6th Cir.1955), cert. denied, 350 U.S. 937, 76 S.Ct. 308, 100 L.Ed. 818 (1956) (involving negligent design of airplane wing). Granted, negligent design was a tort still undergoing significant development in 1966; it was not, however, so unknown or unique that Congress could have failed to realize its existence as part of the common law. For a list of other cases involving negligent design and commentary analyzing those cases, see D. Noel Manufacturer's Liability For Negligence, 33 Tenn.L.Rev. 444, 453-58 (1966); see also Tyson v. Long Mfg. Co., 249 N.C. 557, 107 S.E.2d 170 (1959) (claim that tobacco harvester was negligently designed); Talley v. Beever & Hines, 33 Tex.Civ.App. 675, 78 S.W. 23 (1903) (claim that pear burner was negligently designed). See generally F. James, Products Liability, 34 Tex.L.Rev. 44, 50-66 (1955); cf. R. Wilson, Products Liability, Part II, 43 Calif.L.Rev. 809, 809-11 (1955).
It is also well worth mentioning that the Restatement of Torts, § 398, first published in 1938, recognized liability for negligent design. That section, entitled "Chattel Made Under a Dangerous Plan or Design," provides:
"A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability ... for bodily harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."
See also Davlin v. Henry Ford & Son, Inc., 20 F.2d 317, 319 (6th Cir.1927) (manufacturer's "duty was to use reasonable care in employing designs, selecting materials, and making assemblies ... which would fairly meet any emergency of use which could reasonably be anticipated"). The advent of strict products liability in the early 1960's also surely brought to Congress's attention the viability of an action based on negligent design. See, e.g., Restatement (Second) of Torts § 402(a) (1965); see also Santor v. A & M. Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965); Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963).[6]
*943 Nor is the Wood court's assertion that the saving clause was meant to preserve common law warranty claims persuasive. Although Representative Dingell spoke of preserving warranty claims, he also stated that all common law remedies were to be preserved. 112 Cong.Rec. 19,663 (1966) (remarks of Rep. Dingell). Additionally, "[b]y 1966, forty-eight of the states [including Alabama (effective January 1, 1967) ] had adopted the Uniform Commercial Code. As a result, by that time, warranty actions pertinent to automobiles were statutory and no longer based on [the] common law" that § 1397(c) preserved. Comment, supra, 27 Duq.L.Rev. at 321.
The argument is made that jury verdicts based on common law causes of action would frustrate the purpose of Congress. I disagree. Safety is the purpose Congress expressed in the Act. A jury verdict might inspire a manufacturer to make automobiles safer, but in no event would it result in having less safe vehicles built.
Further, within the confines of this case and the pertinent statutory provisions, I do not believe that a jury's verdict would be "regulatory."[7] I recognize the Supreme Court's words in San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959):
"The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy. Even the States' salutary efforts to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme."
Garmon was not concerned, however, with the comity between state and federal law that implied preemption analysis involves.
Requiring Volvo to pay money damages does nothing more than give Volvo a number of options from which to choose regarding its future conduct. Cf. Ferebee v. Chevron Chem. Co., 736 F.2d 1529 (D.C. Cir.), cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). First of all, Volvo can try this case and, if the jury returns a verdict against it, it can pay and choose to make no changes in its product in the hopes of more favorable jury treatment in the future. This apparently is a course chosen by Ford Motor Company with regard to its failure to install rear seat shoulder harnesses in its automobiles. Compare Fox v. Ford Motor Co., 575 F.2d 774 (10th Cir.1978) (affirming judgment based on verdict in favor of plaintiff injured, and in favor of plaintiff whose decedent was killed, as the result of, inter alia, Ford's failure to install rear seat shoulder harnesses) with Garrett v. Ford Motor Co., 684 F.Supp. 407 (D.Md.1987) (plaintiff's lawsuit included claim that lack of rear seat shoulder harnesses caused injuries). Alternatively, Volvo could install a system comprising both seat belts and air bags, in compliance with Standard 208, and avoid future liability. Volvo also might choose to exercise its right to petition Congress and ask that the preemption clause be clarified, if that clause means what Volvo argues it does. Or, although the choice admittedly borders on being unrealistic, Volvo could remove its product from the marketplace altogether. My point is this: a jury verdict does not require Volvo to do anything, nor does it "regulate" Volvo's conduct, for "as the word [`regulation'] implies in its nature, full power over the thing to be regulated, it excludes, necessarily, the action of all others that would perform the same operation on the same thing." Gibbons v. Ogden, 22 *944 U.S. (9 Wheat.) 1, 209, 6 L.Ed. 23 (1824) (per Marshall, C.J.).[8] Other courts have recognized that the tension a manufacturer faces by having to pay jury verdicts while in compliance with pertinent federal regulations is not a tension adequate to frustrate Congress's purpose absent a clear indication of Congressional intent to the contrary. See, e.g., Abbot v. American Cyanamid Co., 844 F.2d 1108 (4th Cir.1988) (Food, Drug and Cosmetic Act does not preempt common law claims), cert. denied, ___ U.S. ___, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988); Ferebee, supra, 736 F.2d at 1539-43 (Federal Insecticide, Fungicide and Rodenticide Act does not preempt common law tort suits); Raymond v. Riegel Textile Corp., 484 F.2d 1025 (1st Cir.1973) (Flammable Fabrics Act does not preempt common law claims); Hubbard-Hall Chemical Co. v. Silverman, 340 F.2d 402 (1st Cir. 1965) (same as Ferebee); Burch v. Amsterdam Corp., 366 A.2d 1079 (D.C.App. 1976) (Federal Hazardous Substances Act does not preempt common law claims); McIntire v. Estate of Forte, 463 S.W.2d 491 (Tex.Civ.App.1971) (Federal Aviation Act does not preempt common law claims). And in non-air bag cases under the Act before us today, I have cited a number of cases at the beginning of this section of the opinion that support this very principle. It thus seems clear to me that "Congress intended to stand by both concepts and tolerate whatever tension there was between them." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 256, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984). For a cogent discussion of Congress's willingness to accept incidental regulatory pressure where direct regulatory authority would be preempted, see Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988).
Any course of action Volvo might choose in response to a jury verdict in this case would be purely speculative. "The existence of a hypothetical or potential conflict is insufficient to warrant preemption of the state [law]. A state [law] is not preempted by the federal ... laws simply because in a hypothetical situation ... the state scheme might have an anticompetitive effect." Rice v. Norman Williams Co., 458 U.S. 654, 659, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042 (1982). In any event, a properly instructed jury could reach a verdict that would prompt Volvo to choose a course of conduct that, at its worst, would still have Volvo in compliance with Standard 208. See n. 5, ante.
But what of the concern for uniformity of standards? Does permitting a common law cause of action to go to a jury in this case interfere with that concern? To some extent, perhaps it would.[9] Congress, however, made it perfectly clear that its primary objective was promoting safety; indeed, the face of the Act reveals no other *945 purpose. To subordinate the safety objective to the concern for uniformity is to obfuscate it. In my view, the common law could well promote the safety objective, within the confines of Standard 208. To toss out this lawsuit because, if the plaintiffs prevail, it would frustrate the purpose of uniformity is to read into the Act what the words of the Act forbid. The common law, stifled, can not possibly further the safety objective where it is displaced by an unspoken uniformity purpose. Moreover, no court considering the preemptive effect of the Act in non-air bag cases has pointed to the concern for uniformity to preempt a common law cause of action. See those cases cited previously in this section. Why do here that which courts considering safety standards other than Standard 208 have not done?

VIII. Conclusion
Congress has the power and the constitutional authority to preempt state common law when it chooses. With all due respect to my learned colleagues in the majority, the Supreme Court of Alabama has neither such power nor such authority. Canons of statutory construction and settled principles of interpretation militate against the Court's holding. I understand full well the policy behind the holding, but "policy" has never been an appropriate tool for preempting the common law, at least not "policy" as determined by one state court among many. Perhaps policy does compel the result reached today; in my opinion, however, that policy is the prerogative and function of Congress to articulate. I fear that the majority today has usurped a legislative power not intended for this Court's use. For that fundamental reason, I dissent from the Court's holding on the air bag claim.
ADAMS, J., concurs.
KENNEDY, Justice (Dissenting).
From the majority opinion of the Court, I must respectfully dissent.
The order of the trial judge in this cause from which this appeal was taken was entered on March 10, 1988, and reaffirmed on June 17, 1988. The lower court specifically found that federal law preempted appellants' claim based on the absence of air bags and would prevent appellants from introducing evidence that the failure to install air bags constituted a defective design.
This Court, in its opinion, makes the assumption that the trial court first recognized the air bag count as a cognizable state claim and then proceeded to find that it was preempted. It is at this point that I believe the Court has erred.
Nowhere in the briefs of either the appellants or the appellees is there any mention of a dispute as to whether there is a cognizable state claim that could be subject to preemption. At oral argument, no arguments were made as to that issue, which has become the linchpin of this decision.
I do not believe that we can merely assume that the trial court premised its orders on the assumption that there was a state claim, especially in light of the fact that none of the attorneys in their rather voluminous briefs on appeal even addressed that point.
Without giving the parties an opportunity to argue whether there is a cognizable state claim, the Court, in my opinion, is acting arbitrarily in disposing of this issue. I am firmly convinced that it was within the contemplation of all parties that this case on appeal would turn on the issue of preemption only.
Based on the foregoing, I would reverse and remand this case to the trial court so as to give that court, and, more importantly, the parties the right to address the issue and argue their case. The majority opinion, though it may ultimately be held to be correct, is premature and has been entered without first allowing the parties to be heard on the state claim issue.
NOTES
[1] "Secondary impacts" is an industry term used to describe automobile occupant impacts with interior parts of the vehicle after the initial vehicle impact with an outside object.
[2] The pertinent legislation is the National Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1381 et seq.
[3] We believe the trial judge intended his judgment for Volvo to be restricted to only the plaintiffs' "air bag" claims; however, for the sake of clarity, we reverse and remand as to all other asserted claims against Volvo, including those enumerated above.
[1] For a review of the legislative history of the Safety Act, see Wood v. General Motors Corp., 865 F.2d 395 (1st Cir.1988).
[1] Obviously, if an automobile manufacturer were not in compliance with Standard 208, the preemption defense to a negligent design claim would be unavailable. No argument could be made that a jury verdict would "regulate" a manufacturer's conduct pursuant to State common law if, in fact, the manufacturer had not complied with federal statutory (and administrative) law; indeed, the verdict would only prompt compliance. The preemption argument makes sense, then, only when the manufacturer has complied at least with the minimum mandates of federal law and administrative regulations.

The analysis would be different, perhaps, if the federal law was meant to occupy the regulatory field to the exclusion of state law. This type of express preemption, however, is not present in this case. See infra, section V; Wood v. General Motors Corp., supra.
[2] I do not endorse the view that jury verdicts resulting from common law causes of action necessarily impose "standards" or involve state regulation, insofar as the case at bar is concerned. See infra, section VII.
[3] Implied preemption may also obtain where the matter regulated demands "exclusive federal regulation in order to achieve uniformity vital to national interests." Florida Lime & Avocado Growers, supra, 373 U.S. at 144, 83 S.Ct. at 1218; see also San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 241-44, 79 S.Ct. 773, 777-79, 3 L.Ed.2d 775 (1959). This type of preemption has been neither argued nor briefed, however, and I decline to discuss it. Suffice it to say that "uniformity" is not the vital public interest addressed by the Act here reviewed.
[4] I pause to reemphasize, respectfully, that I believe the majority's reliance on Dentson v. Eddins & Lee Bus Sales, Inc., 491 So.2d 942 (Ala.1986), is misplaced. That case did not involve federal preemption of state common law. More importantly, that case analyzed not whether a cause of action was maintainable in the first instance, but whether any duty owed by the defendants had been breached. See id. at 944.
[5] A manufacturing defect has occurred when one, or a few, of the products of a line are defective, such as the occasional exploding soft drink bottle case involves. A design defect has occurred when every product of a line is defective due to a faulty blueprint.
[6] I recall, at this juncture, that "[t]he common law is not static, but is constantly undergoing change, and extension, to meet changing conditions, due to the ever expanding business and social fabric." Woodmen of the World Life Ins. Soc. v. Guyton, 239 Ala. 216, 220, 194 So. 655, 658 (1940). Over a century ago, Mr. Justice Matthews penned the following eloquent lines for the Supreme Court of the United States:

"It is more consonant to the true philosophy of our historical legal institutions to say that the spirit of personal liberty and individual right, which [the best securities for our ancient liberties] embodied, was preserved and developed by a progressive growth and wise adaptation to new circumstances and situations of the forms and process found fit to give, from time to time, new expression and greater effect to modern ideas of self-government.
"The flexibility and capacity for growth and adaptation is the peculiar boast of the common law....
"The Constitution of the United States was ordained, it is true, by the descendants of Englishmen, who inherited the traditions of English law and history; but it was made for an undefined and expanding future, and for a people gathered and to be gathered from many nations and of many tongues.... There is nothing in Magna Charta, rightly construed as a broad charter of public right and law, which ought to exclude the best ideas of all systems and of every age; and as it was the characteristic principle of the common law to draw its inspiration from every fountain of justice, we are not to assume that the sources of its supply have been exhausted. On the contrary, we should expect that the new and various experiences of our own situation and system will mould and shape it into new and not less useful forms."
Hurtado v. California, 110 U.S. 516, 530-31, 4 S.Ct. Ill, 118, 28 L.Ed. 232 (1884). At the very least, then, by 1966, Congress should have known 1) that the common law of products liability included within its ambit automobiles, and 2) that the tort of negligent design was well entrenched in the common law. I put more faith in Congress than to presume it did not fathom that soon the twain should meet.
[7] I must again stress that a properly instructed jury could find that Volvo would not have been negligent had it complied with an alternative restraint system under Standard 208, i.e., had it installed air bags and seat belts. To the extent that a jury verdict might be regulatory, this type of verdict would set a standard identical to the federal standard, which § 1392(d) expressly approves.
[8] See also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 50, 107 S.Ct. 1549, 1554, 95 L.Ed.2d 39 (1987):

"Certainly a common-sense understanding of the phrase `regulates insurance' does not support the argument that the Mississippi law of bad faith falls under the saving clause. A common-sense view of the word `regulates' would lead to the conclusion that in order to regulate insurance, a law must not just have an impact on the insurance industry, but be specifically directed toward that industry. Even though the Mississippi Supreme Court has identified its law of bad faith with the insurance industry, the roots of this law are firmly planted in the general principles of Mississippi tort and contract law. Any breach of contract, and not merely breach of an insurance contract, may lead to liability for punitive damages under Mississippi law."
If the Mississippi law of bad faith does not "regulate" the insurance industry, then surely the Alabama law of products liability does not "regulate" the automobile industry.
[9] See, however, the remarks of the majority in Turner v. General Motors Corp., 514 S.W.2d 497, 506 (Tex.Civ.App.1974):

"The danger that juries will arrive at conflicting conclusions is a hazard every manufacturer who distributes nationally runs. The complex, technical questions facing juries, aided by expert testimony, cannot be more difficult than the questions in such fields as medical malpractice. Finally, the argument that a single jury verdict may have profound consequences disrupting an essential industry has been characterized as contending that the desirability of immunity from liability is directly proportional to the magnitude of the risk created. Comment, Automobile Design Liability: Larson v. General Motors and Its Aftermath, 118 U.Pa.L.Rev. 299, 305 (1969)."